DECISION
{¶ 1} Relator, Harvey Gilbert, brought this original action in mandamus seeking a writ ordering the respondent Industrial Commission ("the commission"), to grant his application for an additional award for violation of a specific safety regulation ("VSSR") and, in the alternative, for a limited writ ordering the commission to conduct a new hearing upon the issues.
 {¶ 2} This case, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, was referred to a magistrate who rendered a decision "that this court issue a writ of mandamus ordering the commission to vacate its order denying relator's VSSR application and in a manner consistent with the magistrate's decision, enter an order either granting or denying the VSSR application." (Attached as Appendix A.)
 {¶ 3} The commission and respondent American Hood Cleaning, Inc. ("AHC"), each filed objections to the magistrate's decision.
 {¶ 4} The parties have filed briefs with respect to the objections and presented oral argument to this court.
 {¶ 5} This court has thoroughly reviewed the briefs, the magistrate's decisions, and the stipulated evidence.
 {¶ 6} In consideration thereof, this court adopts the findings of fact of the magistrate's decision which are incorporated herein, but does not adopt the magistrate's conclusions except as hereinafter noted, nor does this court adopt the magistrate's disposition of this case. Instead, for the following reasons, this court denies the requested writ of mandamus.
 {¶ 7} Relator was previously found by the commission to suffer from an occupational disease as the result of exposure to noxious fumes while working as an employee of respondent AHC. After such award, relator filed his application for an additional VSSR award.
 {¶ 8} Relator last worked for respondent AHC in early September 2001. Later that month, on September 24, 2001, air samples were taken by OSHA for testing and on October 22, 2001, OSHA indicated by letter that "the results did not indicate exposure levels above the OSHA permissible exposure limit for Sodium Hydroxide or Perchlorethylene." However, the employer was cited and paid a fine because of failure to "implement a written respiratory program." By letter dated September 7, 2001, Dr. Middaugh stated that relator required the use of "supplied air hooded respirator" and stated that "there has been no formal hazard evaluation." At the request of the Ohio Bureau of Workers' Compensation, relator was examined by Dr. Lutz who wrote in his report "within reasonable medical probability the claimant's restrictive lung disease is the result of low level, long-term exposures to the Iverson Hot Vat Stripper and by-products without the use of respiratory protection." There was conflicting evidence as to whether respiratory equipment was provided, the type of equipment and whether relator used the provided equipment properly.
 {¶ 9} The specific safety regulations involved herein are Ohio Adm. Code 4123:1-5-17(F)(1) and (2):
(F) Respiratory Protection
(1) Where there are air contaminants as defined in Rule 4121:1-5-01 of the Administrative Code, the employer shall provide respiratory equipment approved for the hazard * * *
(2) This requirement does not apply where an effective exhaust system * * * or where other means of equal or greater protection have been provided.
 {¶ 10} Ohio Adm. Code 4121:1-5-01(B)(4) as follows:
"Hazardous concentrations (as applied to air containments)": concentrations which are known to be in excess of those which would not normally result in injury to an employee's health.
 {¶ 11} We find nothing in the stipulated evidence that any evidence was presented to the commission as to the concentrations of the hazardous fumes to which relator was exposed during his employment the respondent AHC. There is evidence that after relator ceased his employment, the levels of hazardous chemicals were within the limits permitted by OSHA. While this evidence does not indicate that the concentration levels were not higher while relator was an employee, it likewise does not require an inference by the commission that fumes were above the permitted level of concentration while relator was employed. Another reference was statements by doctors, as indicated above, that relator's exposure was "low level, long time."
 {¶ 12} It was incumbent upon relator to present evidence to the commission showing AHC violated the specific safety requirement involved. There is also disputed evidence that no other AHC employee has ever suffered a disease such as relator has. See State ex rel. Hughes v. Goodyear Tire Rubber Co.
(1986), 26 Ohio St.3d 71.
 {¶ 13} While we agree with the commission that an objective rather than an subjective test should be applied with respect to the word "known" as used in the regulation, it makes little difference in this case because relator presented no evidence to the commission of the concentration of the noxious fumes to which relator was exposed. Although relator was found to have an occupational disease as the result of exposure to noxious fumes in the workplace, the only evidence of the concentration of those fumes was Dr. Middaugh's reference to "low-level" and the test results shortly after relator ceased to be employed at AHC, showing the levels at that time to be within the limits permitted by OSHA.
 {¶ 14} Relator has neither shown an abuse of discretion on the part of the commission nor a clear legal right to the requested writ of mandamus.
 {¶ 15} Accordingly, the requested writ of mandamus is denied.
Writ of mandamus denied.
Bryant and Travis, JJ., concur.
Judge Alba Whiteside, retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), ArticleIV, Ohio Constitution.
 (APPENDIX A) IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Harvey Gilbert, : :
Relator, : :
v. : No. 05AP-777 :
Industrial Commission of Ohio and : (REGULAR CALENDAR) :
American Hood Cleaning II, Inc., : :
: :
Respondents. : :
 MAGISTRATE'S DECISION Rendered on April 20, 2006 Harris Burgin, L.P.A., and Jeffrey W. Harris, for relator.
Jim Petro, Attorney General, and Andrew J. Alatis, for respondent Industrial Commission of Ohio.
Dinsmore Shohl LLP, and Brian P. Perry, for respondent American Hood Cleaning II, Inc.
 IN MANDAMUS {¶ 16} In this original action, relator, Harvey Gilbert, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him an additional award for an alleged violation of a specific safety requirement ("VSSR"), and to enter an order granting a VSSR award.
Findings of Fact:
 {¶ 17} 1. In 1998, relator began his employment with respondent American Hood Cleaning II, Inc. ("AHC"). As a "hood cleaner," relator would travel to restaurants to clean hoods, fans and ducts.
 {¶ 18} 2. The chemical used by AHC employees for cleaning was called Hot Vat Stripper manufactured by Iverson Industries, Inc. ("Iverson"). The Iverson product label advised that Hot Vat Stripper is designed to be used in "hot vat cleaning tanks and hot vat cleaning cabinets," and is designed "to remove grease, oil, tar, dirt, rust and most any soil that may be encountered." The Iverson label cautioned: "Always add this powder to water slowly. Do not ingest. Avoid contact with skin, eyes and mucous membranes. Avoid inhalation."
 {¶ 19} 3. The Iverson label also advised that the product is intended to clean ferrous metals only. The label warned: "DO NOTUSE ON ALUMINUM." (Emphasis sic.)
 {¶ 20} 4. On August 15, 2001, relator was initially seen by D. Ann Middaugh, M.D., who is board certified in internal medicine and occupational medicine. Relator was referred to Dr. Middaugh by Patricia Ghory, M.D.
 {¶ 21} 5. On August 15, 2001, Dr. Middaugh wrote:
Harvey Gilbert is a 37 year old man referred by Dr. Patricia Ghory for occupational medical consultation regarding his complaints of recurrent allergic reactions. He is concerned that exposure to a chemical, Iverson Hot Vat Stripper, in the course of his employment cleaning restaurant hoods for American Hood Cleaning has caused recurrent hives and itching.
Mr. Gilbert relates that he has been employed in the same job for the past 5 years. He works cleaning the grease, grime, debris and build up from commercial hoods which vent grills and ranges of restaurants throughout the TriState area. About 2 years ago he began developing hives and itching. This necessitated multiple emergency room visits for treatment with benadryl. He had evaluation from Dr. Michael, an allergist at Group Health, and states that he had some pulmonary tests, RAST tests, skin prick tests, and was given Singulair, Claritin, Zyrtec and inhalers, without improvement.
In July, 2001 he had worsening of symptoms, and felt like his throat was closing off. He went to the Christ Hospital ER on 7-2-01 and was given oxygen, IV fluids. He denies wheezing, but felt as though his throat was closing off. He had another episode of hives developing after simply picking up a cucumber at Krogers. He had the onset of tingling in his fingers, then localized and generalized hives. He immediately left Krogers, and took Benadryl. He became alarmed about these worsening symptoms, and sought a second opinion from Dr. Ghory, who treats his family members.
He presented to Dr. Patricia Ghory on 7-13-01. She assessed idiopathic anaphylaxis, and provided him with an epi-pen. Evaluation included spirometry which showed a restrictive defect, FVC 3.18 or 65% predicted, with FEV1 2.82 or 72% predicted and a ratio 88%. There was no significant improvement with bronchodilator. Prick testing was positive for histamine, and multiple foods, tree mix, weed mix, grass, ragweed. Laboratories included normal RA Latex, Sed rate of 6, and elevated IgE of 171 ( 158), normal IgG, IgA and IgM. RAST testing was positive for soybean, corn, tomato, grape, sunflower seed, almond, walnut, cashew, hazelnut, walnut, and negative for cucumber, and pecan nut.
Dr. Ghory obtained the MSDS for the Iverson Hot Vat Stripper, and referred him for occupational assessment.
Mr. Gilbert states that symptoms initially began only at work. He could tell when he is having an allergic reaction because his fingers get tingling, and then the hives come. He states he has an inch thick file of ER visits in Dr. Michael's office. Initially symptoms were only at work, but then he would have episodes after eating grapes, and nuts. He doesn't understand, because he can eat peanut butter without trouble. He then had the one episode after handling the cucumber. He has no prior history of allergy or atopy, and has a negative family history for allergy. He is a smoker, at ½-1 pack daily, and knows he should quit. He has never had trouble with asthma or wheezing. He uses no inhalers. He cannot relate the onset of hives to any one activity, although they were always at work to start with.
He cleans restaurant kitchen hoods. He is employed by Mr. Dan Brannigan, owner of American Hood Cleaning. There are 4 employees, all of whom are Mr. Gilberts relatives. He works at night, after the kitchens have closed down. Restaurants have contracts with American Hood Cleaning, and he will go to the same place maximally every 3 months, sometimes much less often, such as every 6 months.
The Iverson Hot Vat Stripper is a caustic soda solution with sodium carbonate, sodium tripolyphosphate, sodium gluconate, alkoxylated linear alcohol, a chelating agent and low foaming surfactant. The pH is 11.9 for a 2% solution. The MSDS clearly notes the need for industrial hygiene practices, adequate ventilation, use of a dust mask, suitable protective clothing and eye protection to prevent skin and eye contact. A NIOSH approved respirator is required.
He works alone, out of a van. He will take the stripper powder and transfer it by a scoop from a 100# tub into another container which he keeps in his truck. At the restaurant, he will surround the area to be cleaned with plastic. He mixes the powder into water, which results in a hot and bubbling solution. He sprays this with a pump and hand held wand apparatus. He states that the employer developed stainless steel wands as the stripper ate up and corroded brass wands. He sprays the dirty surface, waits 10-15 minutes, and then uses a steam pressurized hose from his truck, at 300psi to rinse off the debris. This runs down into the plastic, and is disposed of in the sewer. He may work outside, on the roof of the restaurant as well, doing the same operation.
He will wear plastic latex gloves. He used no other protective equipment until 2 weeks ago when his boss gave him a ½ face mask air purifying respirator to wear after he asked for one on the advice of Dr. Ghory. He has been given safety glasses, but can't use them inside the plastic, because they steam up when he puts his head in the plastic area to direct the steam. He has never used respiratory equipment while scooping the powder. He does not use other protective clothing. He gets moisture and splashes on his arms, and has a chronic dermatitis, and scars from chemical burns. He wears a short sleeve t-shirt for work, as the solution puts holes in all his long sleeved shirts. He has not had any eye splashes yet. There is limited air flow in the area around the plastic, and hood while he is cleaning.
There is no history of acute inhalation injury at work. He notes that all the hives and itching began at work, and cannot think of a clear association with a specific restaurant or exposure.
He has no allergic symptoms to environmental exposures, change of seasons, or animals. Symptoms after eating peanuts and grapes started sometime later. No history of chronic sinus disease. * * *
* * *
Initial clinical impression is exposure to a caustic without respiratory protection, with chronic long term exposures, likely to low levels of powder (particulates) and aerosols. Possibly his allergic reactions relate to intermittent and unpredictable inhalation of food proteins, or other reactive substances such as bacterial byproducts in the aerosols generated through the cleaning process. One must rule out restrictive lung disease and pulmonary fibrosis given the defects on spyrometry.
This was discussed with Dr. Ghory, who made arrangements of lung volumes, diffusion capacity and CXR to be done through an approved provider. Mr. Gilbert will get these studies, return in follow-up and bring in his respirator so we can check it out.
 {¶ 22} 6. On August 21, 2001, relator returned to Dr. Middaugh, who wrote:
I reviewed the MSDS for the Iverson Hot Vat Stripper. I contacted Iverson, the distributor, located here in Cincinnati. They referred me on to Warsaw Chemical Co. in Illinois. I was able to reach the Safety person at Warsaw Chemical on Monday, 8-19-01, Jay Sweatland, and he states they do not have a toxicologist or physician on staff. He indicated that they combine the ingredients for the stripper, and will be providing me with all the information by fax. This is pending to date.
Mr. Gilbert returns today, and has brought his respirator which is air-purifying, and has cartridges for organic solvents. He has been wearing this at work, and has not had any further allergic episodes.
* * *
The respirator fits, and he was given training. Laboratories show restrictive lung disease with the TLC at 70% predicted, VC 70% predicted, RV 67%, Diffusion corrects for alveolar volume. Chest x-ray was done at The Christ Hospital 8-17-01 and is reported as "no active chest disease[.]" We don't have the actual films to look at.
Advised Mr. Gilbert that he has reduced lung function, based on the PFTs. Discussed with Dr. Ghory, and will arrange for high resolution CT scan with inhalation and exhalation images to rule out bronchiolitis obiterans.
Long review of situation with Dr. Ghory. I still cannot attribute the allergic reactions to a specific agent at work. The restrictive lung disease is likely due to the long term low level exposures to the stripper. He has no other reason to have restrictive lung disease.
I also discussed the case with Dr. Roy McKay, who is concerned that the respirator provided is inadequate for protection, and that there may be some element of confined space entry to deal with as well. He felt a fully hooded supply air respirator would be more likely to provide adequate protection, and recommended a hazard evaluation.
 {¶ 23} 7. On August 29, 2001, Dr. Middaugh wrote:
* * * He would like me to speak with Mr. Dan Brannigan (employer) regarding need for safety measures at work. * * *
Received the MSDS info from Warsaw Chemical[.] There is a defoamer, Chemac DFP-13 described as a silicone defoamer, noted to be an irritant with inhalation. Contacted the manufacturer, Chemax in Greenville, SC, Charlene Patterson 864-422-6654 who stated she will send us this information by FAX, noting it is proprietary in nature.
Phoned and spoke with Mr. Brannigan on afternoon of 8-29-01[.] Advised him that Mr. Gilbert has restrictive lung disease which I attribute to exposure, that he needs to provide appropriate respiratory and other equipment, have a respirator program, hazard assessment, should reevaluate work site practice, and that we will be filing workers' comp for restrictive lung disease diagnosis. He was given name and number for Dr. McKay. He stated he would investigate this, contact Sheakley, his attorney and the chamber of commerce. He told me he worked in the industrial spray paint industry for 20 years and was very knowledgeable about respirators and what OSHA requires. I advised him that depending on findings, medical evaluation of his employees would probably cost in the rage of $200 each for initial medical and respirator evaluation given the known exposures.
 {¶ 24} 8. On September 5, 2001, Dr. Middaugh wrote:
Mr. Gilbert returns with his wife. He cut off the label from the Stripper — [Two] Allergic reactions — cause still undetermined. He needs see chart. He states he knows that the filters have aluminum and they are using this despite warning on label. He states the employer hasn't done anything regarding safety and health, that he won't send other employees for evaluation, provide supply air hooded ambient respirators, and hasn't had a hazard evaluation. * * *
Dr. McKay reviewed exposures with Mr. Gilbert. Recommend a good dust mask for scooping operations, protective hood for spraying especially considering the eye splash risk, and the ambient supplied air respirator, along with Tyvek suit or other splash resistant material. This would likely be the safest equipment given that there is no specific hazard evaluation regarding exposures. Noted that employer had not contacted him for information or consultation.
* * *
Explained to Mr. Gilbert that I believe he has 2 processes going on:
[One] Restrictive lung disease caused by long term, low level inhalation of the caustic. There is no other explanation for this. Fortunately, we have discovered this diagnosis early, and that with removal from exposure, or appropriate protection, it should not progress. He needs repeat lung functions in 3 months. He was also advised to quit smoking.
[Two] Allergic reactions — cause still undetermined. He needs to continue follow up with Dr. Ghory, provide careful evaluation for any further allergic reactions.
Plan:
[One] Given recommendations regarding protective equipment. He has asked me to send a letter to his employer.
[Two] File FROI for restrictive lung disease.
[Three] Follow-up here in 3 months — if he can't get respiratory protection, I will need to remove him medically from the work site. If he does, then repeat PFT's in 3 months and 6 months. If there is any progression, removed from exposure, then referral for bronchoscopy and potential lung biopsy.
 {¶ 25} 9. By letter dated September 7, 2001, addressed to relator, Dr. Middaugh explained:
We have performed detailed evaluations, and have found that you have two separate problems. The first problem, allergic responses, remains unexplained. So far we cannot identify with certainty a cause for the anaphylactic (allergic) problems you have been experiencing. Although this could be from work exposures, it has occurred away from work, and the cause is not yet clear.
In the process of this evaluation for allergies, we have discovered that you have restrictive lung disease. This is a condition where the lung capacity becomes smaller, or restricted, than normal, from exposure to agents that cause irritation or fibrosis in the lungs. I am unable to find any cause for this process aside from the exposures you have had at a low level, and over the long term, to the Iverson Hot Vat Stripper, and byproducts in the course of your employment for American Hood Cleaning.
After hearing of your occupational exposures, and reviewing the work activities with you and Dr. McKay, it is my recommendation that you should not have further exposure to the Iversion Hot Vat Stripper or the byproducts from cleaning unless you are provided with appropriate respiratory protection, and protection for your eyes and skin. Since there has not been a specific hazard evaluation, the recommended equipment would be at least a well fitted dust mask, gloves and safety glasses while scooping the powder form of the stripper. While using the solution, you should use an ambient air supplied fully hooded respirator, and appropriate protective gear for your skin. Your employer needs to have a respirator program in place, per OSHA requirements, and you should have regular medical evaluation, and clearance for respirator use.
If you are not provided with appropriate protective equipment, then I will need to medically remove you from work. If you are provided appropriate protective equipment, then we should re-evaluate your lung function in 3 months time, and again in 6 months.
If there is any further decline in your lung function, we would need to do additional tests.
* * *
We have filled out the necessary forms (FROI) for submission to Workers' Compensation for the diagnosis of restrictive lung disease (respiratory disorder from chemical exposures).
 {¶ 26} 10. By letter dated September 7, 2001, addressed to Mr. Branigan, Dr. Middaugh explained:
As you know from our telephone conversation of August 29, 2001, I have evaluated your employee, Harvey Gilbert regarding occupational lung disease. Mr. Gilbert has restrictive lung disease, for which there is no other identifiable cause or explanation other than the long term, low level respiratory exposure to the Iversion Hot Vat Stripper and associated by-products in the course of his employment over the past 5 years. We have filed for workers' compensation for this diagnosis. He also has a chronic irritant dermatitis on his arms from the chemical exposures. To date, I cannot attribute his allergic problems to his employment, although that could be possible.
Mr. Gilbert requires the use of personal protective equipment in order to continue his employment and exposures. Given that there has been no formal hazard evaluation, Mr. Gilbert requires at minimum a well fitted dust mask, safety glasses, and gloves while handling the dry product (ie scooping from the large containers to smaller containers) to avoid powder inhalation and skin or eye deposition. While using the solution, he should be provided with an ambient supplied air, fully hooded respirator, and a protective suit for skin exposures. If you are not able to provide such protective equipment, then it is my medical recommendation the [sic] Mr. Gilbert should be medically removed from employment and exposures until such equipment is supplied and/or a formal hazard assessment is accomplished and more specific recommendations become available. This should be done in compliance with the Federal OSHA Standards. I understand that you are quite familiar with the Respirator Standard from your previous experience in industrial painting.
 {¶ 27} 11. On September 24, 2001, the Occupational Safety and Health Administration ("OSHA") conducted air sampling at Kennings Circle K Restaurant pursuant to OSHA's investigation of AHC during September 2001.
 {¶ 28} 12. On September 28, 2001, following its investigation, OSHA issued multiple citations to AHC. Among the citations issued, OSHA alleged that, in violation of29 CFR 1910.134(c)(1): "The employer did not establish and implement a written respiratory program with required site specific procedures and elements for required respiratory use."
 {¶ 29} 13. By letter dated October 22, 2001, Mr. Branigan was informed by OSHA area director William M. Murphy:
Enclosed are the results of samples collected on September 24, 2001 to evaluate employee exposure levels at Kennings Circle K Restaurant, 6166 Bridgetown Road. The results did not indicate exposure levels above the OSHA permissible exposure limit for sodium hydroxide or perchloroethylene.
 {¶ 30} 14. AHC and OSHA entered into an informal settlement agreement to resolve the citations issued on September 28, 2001. AHC agreed to pay a penalty of $1,500 on or before April 30, 2002.
 {¶ 31} 15. By letter dated November 29, 2001, Mr. Branigan informed Mr. Murphy:
This letter is for Citation #304707664 Item# 1, 2, 3, 4[.] These citations all refer to respirator's [sic].
Due to the air monitoring test OSHA performed at the job site we no longer require that our employees wear respirator's [sic].
 {¶ 32} 16. Earlier, on October 11, 2001, at the request of the Ohio Bureau of Workers' Compensation ("bureau"), relator was examined by James T. Lutz, M.D., who is board certified in occupational medicine. Dr. Lutz wrote:
IMPRESSION: Harvey Gilbert has sustained a chronic respiratory restrictive lung disease as the direct result of his employment activities and exposures while working for American Hood Cleaning II, Inc. Within reasonable medical probability the claimant's restrictive lung disease is the result of low-level, long-term exposures to the Iverson Hot Vat Stripper and byproducts without the use of respiratory protection.
 {¶ 33} 17. The industrial claim is allowed for "fume/vapor chronic respiratory condition and active bronchiolitis due to infectious organism," and is assigned claim number 01-848148. (See complaint at paragraph four, and respondents' answers.)
 {¶ 34} 18. On August 8, 2003, relator filed a VSSR application which prompted an investigation by the bureau's safety violation unit. The bureau's special investigator issued a report on March 1, 2004.
 {¶ 35} 19. The bureau's special investigator obtained an affidavit from relator, which was executed March 1, 2004. Relator's March 1, 2004 affidavit states:
[Two] I was diagnosed September 5, 2001 with restrictive lung disease. Prior to being diagnosed, I was going to jobs and would break out with hives and swell up. When this would happen, I would go to the emergency room. I did this approximately ten (10) to twelve (12) times prior to going to see a specialist regarding my problem(s).
[Three] The process of hood cleaning involves the removing of the hood filters and wrapping the hood with plastic that emptied to a garbage can. We would then mix the chemicals and spray the chemical in the hood and duct, then take the filter outside to spray. To clean the hood, we would get inside of the hood and spray. The chemical would stay in the air and drip down onto me. Also, when spraying on the roof to get the fans, the wind sometimes would blow the chemical back onto me. After about fifteen (15) to twenty (20) minutes we would rinse the chemical off of the hood, duct and filter. At the completion of the cleaning, we would dump the contents of the garbage can into the sewer drains. The number of jobs we would complete in a week would depend on what needed done. Sometimes we would complete three (3) jobs in one night.
[Four] When I was working, I could feel a burning in my nose and throat while I was spraying. The chemical would take my breath away. Before we were provided with safety goggles, my eyes would burn and water. We were not provided with safety goggles until after OSHA became involved.
[Five] When American Hood Cleaning would get the Hot Vat Stripper, the chemical used for cleaning, Dan Branigan, owner of American Hood Cleaning would put the chemical powder into a large bucket with a lid on it. The mix of this chemical would be two (2) unmeasured cups of the chemical powder with cold water. When the bucket that we mixed the chemical in would reach the top, the mixture was bubbling like boiling water.
[Six] American Hood Cleaning did not provide me with any type of respiratory equipment until OSHA and my physician became involved. I utilized the respirator that American Hood Cleaning provided me until my physician pulled me from work.
[Seven] The chemical's label stated that the chemical should not be used on aluminum. Most of the filters in restaurants hoods are constructed of aluminum. However, we still used the Hot Vat Stripper because that was the only chemical provided by American Hood Cleaning. When the chemical was sprayed onto aluminum, there was a reaction of some type. This reaction would produce smoke and an odor similar to a burning odor. * * *
 {¶ 36} 20. The bureau's special investigator also obtained for his report copies of Material Safety Data Sheets ("MSDS") issued for the Iverson Hot Vat Stripper. The MSDS are issued for compliance with OSHA regulations.
 {¶ 37} 21. The MSDS for the Iverson Hot Vat Stripper indicates that, chemically, the product is "a blend of carbonates, chelating agent, sodium hydroxide and surfactant." Under Section 9 "Special Protection Information," the MSDS lists "respiratory protection * * * NIOSH/MSHA Approved."
 {¶ 38} 22. The bureau's special investigator also obtained for his report copies of the MSDS issued for another Iverson product described as "Sodium Hydroxide 1310-73-2." Under Section 6 "Health Hazard Data," the MSDS states:
Chronic: The chronic local effect may consist of multiple areas of superficial destruction of the skin or of primary irritant dermatitis. Similarly, inhalation of dust, spray, or mist may result in varying degrees or irritation or damage to the respiratory tract tissues and an increased susceptibility to respiratory illness.
Acute: Corrosive to all body tissues with which it comes in contact.
* * *
Other effects/data:
Eyes: This product is destructive to eye tissues on contact. Will cause severe burns that result in damage to the eyes and even blindness.
Skin: This product is destructive to tissues contacted and produces severe burns.
Ingestion: This product, if swallowed, can cause severe burns and complete tissue perforation of mucous membranes of the mouth, throat, esophagus and stomach.
Inhalation: Airborne concentrations of dust, mist, or spray of caustic soda may cause damage to the upper respiratory tract and even to the lung tissue proper which would produce chemical pneumonia, depending upon severity of exposure.
 {¶ 39} 23. Relator's VSSR application was heard by a staff hearing officer ("SHO") on October 14, 2004. The hearing was recorded and transcribed for the record.
 {¶ 40} 24. During the October 14, 2004 hearing, relator testified as to how he performed his job at AHC:
[Relator's counsel]: So, Mr. Gilbert, if you would, explain briefly what you did during your job for American Hood Cleaning.
[Relator]: Okay. I would go out — we kept our trucks — Dan let us keep our trucks. I would go out and go to the job. I would hang plastic around the hood, and then I would pull the filters down.
After I get the filters down, I would go get my five-gallon bucket to mix the chemical. We never did have no measuring cup to tell us how much to put into the bucket. So I would just get a cup or whatever I could find. They was never no measuring cup provided for us to pour in there.
Let me also let you know that not every job would you use the same chemical amount. For instance, if you're at a nursing home, a nursing home will not use the same amount of chemical as a Burger King or a Chinese restaurant, because of the grease factor.
So when I would get in there, after I pull that out, I would mix the chemical up. That's what we do. We put it in a five-gallon bucket, go in and start pouring cold water into it and start stirring it. As you would stir it, you could smell the vapors and stuff burning your throat and your neck. Smoke comes up from the chemical as you're mixing it.
After that, we would pour it into a mister, which is like a five-gallon thing that you would spray for maybe roaches or something with.
Then we go back and we would spray our hood, leaning up inside of it, spraying the hood and inside the duct. After we did that, we would go outside and take the filters and spray them.
Well, when you get outside and you start spraying your filters — your filters are aluminum. Well, the chemical even calls for you not to use — not to spray that on aluminum, on the MSD sheet. When you would spray it on there, it would turn the filters gray and brown, and start smoking.
I would say probably 96 percent of your jobs, maybe 97 percent of all your filters and jobs are aluminum. And 100 percent of your fans on the roof are aluminum. That's including the fan, and when you pull your fan off, the blades, and the inside of the mushroom.
So after that, after we would spray that, I would go up on the roof and I would spray the fan and rinse it, and then pick it up and lay it down, and then spray the blades. But you've got to let it sit on there. But while you're letting it sit or spraying it, the mist is blowing back on your face, and you're breathing it. Then, after that we would go down and spray the inside of the hood and the duct where the stuff would drip on you.
[Relator's counsel]: During this period, what was the atmosphere that you were working in like?
[Relator]: It was enclosed. When you put the plastic up, you're in an enclosed area when you're spraying that. And when you're mixing it up inside a building, it's an enclosed area.
[Relator's counsel]: And is there mist and vapors around you when you're doing that?
[Relator]: Right. When you go to mix that chemical up, and you've got your spoon and you're mixing that up, when you put that chemical in the bottom and then you add the cold water to it, by the time you take your spoon and start mixing that, the vapors are coming up from the top. You mix that with cold water, by the time it reaches the top, it's boiling.
[Relator's counsel]: And then, when you're using the mister, is the mist in the same area as you're breathing?
[Relator]: Yeah, yeah. It's in the same area we were breathing and spraying. And we never had no masks, no nothing the whole time I worked there. He never provided us with nothing. Not until I went to OSHA did we ever get provided with anything. * * *
* * *
[Relator's counsel]: How long would the jobs take that you were performing?
[Relator]: Probably — it depends on the job. It would really depend on the job. Some of them would take two hours. It just would depend on what kind of job you was at.
[Relator's counsel]: And how much of that time were you actually in an area where there was mist or vapors?
[Relator]: Probably about an hour and a half, even if you are including outside. * * *
Following relator's direct examination, employer's counsel played a video for the hearing officer. That video has not been submitted to this court. However, employer's counsel described the video as follows:
I would like to start by showing just maybe a two or three-minute segment, which just demonstrates someone doing the hood cleaning operation so we all can see exactly what it is that we're talking about.
* * *
* * * [W]atching the videotape certainly gave you a much better understanding of what they're talking about when they're cleaning the hood, and how the plastic is used to funnel the residue into the garbage can, and how the entire process works.
 {¶ 41} 25. During the October 14, 2004 hearing, Mr. Branigan testified as to how the cleaning job was performed:
[Employer's counsel]: * * * [W]hy don't you describe exactly what your business involves?
[Mr. Branigan]: What we do, we remove the grease and dust that builds up in the ducts and exhaust ducts in restaurants, cooking equipment. It's similar to, on a greater scale, like a hood above your stove in your house, but obviously to a greater extent.
Anyway, how we do ours — and I'm not going to dispute basically what Harvey says. We use plastic. We tuck it up between what's called the back splash or the back wall of the cooking equipment, and tuck it up under — between the back wall and the hood and wrap the hood in plastic.
And that plastic comes — when Harvey started with me, I showed him how we do that. And it was different than what he did, slightly different than what he did with PK. But it comes around to the middle of the hood, and it's taped on at the top, or clipped on with spring clamps.
And then you remove your exhaust filters inside the hood and take them outside, obviously, and that stuff. And we do use the hot vat stripper. At the time, it was a hat [sic] vat stripper. Now it's the same product, but with a different — we buy from a different supplier. It's called Hood Cleaner, but it's still hot vat stripper. And we mix it in a five-gallon bucket.
And at the time, there's — to be specific, the size of measuring cups is probably an 8 to 12-ounce cup that was always with my work crew. They — where they got the cups at, probably from a customer, or maybe a fast-food cup, whatever. But that's how it was mixed. And it was always told a cup and a half of that per five gallons. They were instructed on that, the proper handling of that.
[Employer's counsel]: Now, Dan, you indicated that you, yourself, actually trained Harvey when he began?
[Mr. Branigan]: Yes, I did.
[Employer's counsel]: And would you have trained him on how to mix the chemicals as you've just described?
[Mr. Branigan]: Yes, I did.
[Employer's counsel]: Would you have trained him on how to spray on the chemical to the hood and the vents and the different things?
[Mr. Branigan]: Yes, sir. And because Harvey had past experience with the hood and duct cleaning, the training wasn't very long, maybe two or three days, something like that.
 {¶ 42} 26. Mr. Branigan further testified that, at the time he trained relator, he gave relator copies of the MSDS relating to the Hot Vat Stripper and he was told that the chemical is toxic. Mr. Branigan also testified that he would not ordinarily be with relator when relator was on site performing a cleaning job. (Tr. at 46.)
 {¶ 43} 27. Mr. Branigan testified that, in 1998 when relator was first hired and trained, Mr. Branigan provided relator a "paper face mask." But this was not a "rubber respirator." (Tr. at 49.) According to Mr. Branigan, he provided relator with rubber gloves, "rain suits," safety glasses and uniforms. (Tr. at 49-51.)
 {¶ 44} 28. During the hearing, Mr. Branigan disagreed with relator as to how the cleaning was to be performed:
[Employer's counsel]: Okay. Now, in his affidavit that he submitted to the safety investigator, Mr. Gilbert describes getting inside of the hood and spraying in such a manner that the chemical would essentially be dripping down on him. Is that the way that you would clean a hood?
[Mr. Branigan]: No. We've never instructed — I mean, logically speaking, if you look at the tape, cooking equipment, underneath the exhaust, you have deep fat fryers, a griddle, a charbroiler. These are all commercial, big, big units. Some of them are on wheels, some of them aren't. I would say more than 75 percent of the restaurants, these are fixed — or not fixed, but they're stationary pieces of equipment that don't move.
So standing underneath something and knowing that this chemical is a toxic, I would never instruct to stand underneath, inside this area. You would have to be — I hate to say it. You would have to be an idiot to stand underneath that. You would have to be an idiot.
[Employer's counsel]: Now, is it safe to say, then, that when you trained Mr. Gilbert, you did not instruct him to stand underneath the hood when he was performing this operation?
[Mr. Branigan]: No.
[Employer's counsel]: Okay. And is the proper way to perform the operation similar to what we saw on the tape?
[Mr. Branigan]: Yes.
[Employer's counsel]: Where there's essentially like a curtain and you reach into the curtain and you spray?
[Mr. Branigan]: Absolutely. That's how they were instructed to do it. And maybe at the time when Harvey first started, and I don't believe it's even that, they were using two-and-a-half-gallon garden sprayers with a brass wand that was about 18 inches long, with a hose that was attached to it. And they would hold the bottle, or the bottle would be sitting on the floor, and they would reach in through the opening in the plastic and spray the hood.
The nozzles on those sprayers, they could go to a mist or they could go to a stream. You could have a mist application or it could be a straight-line stream. However they did it, I didn't care. I didn't care.
[Employer's counsel]: Now, in terms of —
[Mr. Branigan]: But I know, for most of the time, it was not a mist. It was more of a straight-line stream.
 {¶ 45} 29. During the hearing, Mr. Branigan testified about the OSHA citations and about his settlement with OSHA:
[Mr. Branigan]: And we also got fined for not having a respirator program. During — when they did the air —
[Employer's counsel]: Let's — this is important, so I want to slow down and go through this sort of step by step. Ultimately, the $7,500 penalty was reduced to $1,500?
[Mr. Branigan]: That's correct.
[Employer's counsel]: And at the time you were negotiating with Mr. Murphy, the air sampling had not been performed, is that correct?
[Mr. Branigan]: It had not been performed. I think I stated, by the time I had the settlement agreement meeting, and then when I received the air quality assessment, was a week or ten days or something after the settlement hearing.
[Employer's counsel]: Was there a conversation that you had with Mr. Murphy from OSHA in terms of whether or not you had to immediately implement a respirator program or whether or not you could wait until you got the results of the air sampling back?
[Mr. Branigan]: At that hearing, that was brought up. And he said, well, why don't we wait until after the air quality assessment comes back and see if you need it. And I said, I have no problem with that.
 {¶ 46} 30. During the hearing, Mr. Branigan testified as to how the OSHA air sampling was conducted:
[Employer's counsel]: * * * And did OSHA subsequently come out and perform air sampling?
[Mr. Branigan]: Yes.
[Employer's counsel]: And you ultimately received a letter from Mr. Murphy, dated October 22nd, 2001, providing you with the results of those samples, is that correct?
[Mr. Branigan]: That's correct.
[Employer's counsel]: And this indicates that samples were taken on September 24th of 2001 at the Kings Circle K Restaurant, is that accurate?
[Mr. Branigan]: That's correct.
[Employer's counsel]: And explain for [the hearing officer] how the air sampling was performed.
[Mr. Branigan]: It was a battery type of a pump that they connect to the belts of my workers. And there's a tube that came to some kind of a collecting device, it almost looked like a microphone type thing that clipped to their collar. And they would wear it. They wore it all day, during that whole job. It took about two and a half hours or so, two and a half hours. And at the time, both of my workers had that at the time.
 {¶ 47} 31. Mr. Branigan further testified about his receipt of the results of the OSHA air sampling:
[Employer's counsel]: And ultimately those results were underneath the limits for perchloroethylene and also the sodium hydroxide?
[Mr. Branigan]: Yes, it was definitely below that.
[Employer's counsel]: And then, subsequent to that, there was a letter that you wrote to William Murphy on November 29th
2001, indicating, due to the air monitoring test OSHA performed at the job site, we no longer require that our employees wear respirators. Did you, in fact, send that letter to Mr. Murphy?
[Mr. Branigan]: Yes, I did.
[Employer's counsel]: Did anyone from OSHA, Mr. Murphy or anybody else, call you back, come out, do anything to say we disagree or we do think there is a hazard or you do need to implement the respirator program?
[Mr. Branigan]: No.
 {¶ 48} 32. Mr. Branigan also testified that upon Dr. Middaugh's request, he provided relator with respiratory equipment:
[Employer's counsel]: And after Mr. Gilbert saw Dr. Middaugh, you did make efforts to obtain essentially special respirator equipment for Mr. Gilbert, is that correct?
[Mr. Branigan]: I bought two separate ones.
[Employer's counsel]: And we have the invoices included as attachments to our memorandum. Is it accurate Mr. Gilbert was sent over to Dr. Middaugh's occupational health center and saw this Roy McKay, who did a respirator fit testing with him?
[Mr. Branigan]: That was on the first one, a rubber device with cartridges on the front.
[Employer's counsel]: And then at some point, Dr. Middaugh indicated that she thought that Mr. Gilbert, because of his condition, should have an even more substantial respirator, a hooded type respirator?
[Mr. Branigan]: Right, hooded type with vats that splashed on fresh air [sic].
[Employer's counsel]: Did you, in fact, provide that type of respirator?
[Mr. Branigan]: Yes, I did. You will see the receipt for that. And we had Harvey down at my house and showed him how it works and how it fits on[.] * * *
 {¶ 49} 33. During the hearing, Mr. Branigan further testified what the video demonstrates as to the industry practice:
[Employer's counsel]: Now, on the videotape demonstration that we observed, I noticed that the person in that tape was not wearing any sort of respirator while they were doing the hood cleaning. Could you explain to [the hearing officer] your knowledge of what the industry practice is with respect to respirators?
[Mr. Branigan]: As far as I know, no one wears respirators of any sort.
 {¶ 50} 34. Mr. Branigan also testified that when he first bought the business, he telephoned "Warsaw Chemical" and talked to their "chemist" because Mr. Branigan was concerned about the indication on the MSDS that respirators were needed. According to Mr. Branigan, he was told by the expert that respirators were not needed. According to Mr. Branigan, when he first bought the business, he used the Hot Vat Stripper himself for a six or eight month period without using a respirator. According to Mr. Branigan, no other employee of his has developed a lung condition. (Tr. at 63-64.)
 {¶ 51} 35. During cross-examination by relator's counsel, Mr. Branigan was questioned about how the cleaning job could be performed safely without using a respirator:
[Relator's counsel]: There was a portion of the video where the individual who was cleaning leaned inside the opening of the wrap-around. Was that something that happened on all the jobs?
[Mr. Branigan]: Yeah.
[Relator's counsel]: That happened on a frequent basis?
[Mr. Branigan]: Yeah.
[Relator's counsel]: So, basically, the people would be leaning underneath the area that they would be spraying?
[Mr. Branigan]: They would be reaching in to spray, like, this area or that area. And when it got to right above you, you're standing outside, not reaching in there, and spraying. It's pretty simple.
[Relator's counsel]: But within the area that they were spraying, they were often inside of that —
[Mr. Branigan]: You're blowing it all out of proportion. Inside, no. You're talking about standing inside or sticking your arm inside? There's a significant difference. You would have to be an idiot to stand inside and spray this. * * *
* * *
[Relator's counsel]: But it's possible people may have leaned inside or put their head inside when doing this job?
[Mr. Branigan]: They may have.
[Relator's counsel]: Did you ever discipline anybody for doing that?
[Mr. Branigan]: As I told you, I was rarely on the jobs with them.
[Relator's counsel]: But you did say you would have to be an idiot to do this practice?
[Mr. Branigan]: Stand inside of it. Put it all together. Stand inside, stand physically inside. If this is a particular hood, stand right here in the middle and then spray.
[Relator's counsel]: Is that different, in your definition, than putting your head inside?
[Mr. Branigan]: Absolutely, it is.
[Relator's counsel]: Okay. Could you please explain the differentiation to me?
[Mr. Branigan]: What's the difference? It's reaching your arm in there and spraying this area and that area. And then when you do this area in front of you, you pull back and you spray it, as opposed to standing inside and spraying it and it dropping all over the top of you. It's not that hard. It's not that hard.
[Relator's counsel]: I'm not asking about whether just your arm is in. I'm saying that when your head is in the area — there may have been times when the person's head was inside the contained area. In that circumstance, then the chemical would have been on them, as well, correct?
[Mr. Branigan]: If they're sticking their head in there, they're doing it wrong.
 {¶ 52} 36. Following the October 14, 2004 hearing, the SHO mailed an order on December 7, 2004 denying the VSSR application. The SHO's order states:
The injured worker's central focus is on the alleged violation of O.A.C. 4121:1-5-17(F)(1)(2). Respiratory Protection. O.A.C. 4121:1-5-17(F)(1)(2) specifically provides that:
(F) Respiratory protection.
(1) Where there are air contaminants as defined in rule 4121:1-5-01 of the Administrative Code, the employer shall provide respiratory equipment approved for the hazard. It shall be the responsibility of the employee to use the respirator or respiratory equipment provided by the employer, guard it against damage and report any malfunction to the employer. Note: See appendix to this rule for basic guides for the selection of respirators.
(2) This requirement does not apply where an effective exhaust system (see rules 4121:1-5-18 and 4121:1-5-992 of the Administrative Code) of [sic] where other means of equal or greater protection have been provided.
The Staff Hearing Officer finds that "air contaminants" is defined under O.A.C. 4121:1-5-01(B)(4) as "hazardous concentrations of fibrosis-producing or toxic dusts, toxic fumes, toxic mists, toxic vapors or toxic gases or any combination of them when suspended in the atmosphere."
The injured worker alleges that the air contaminant that he was exposed to was Iverson Hot Vat Stripper. The injured worker alleges that his work exposed him to a chemical powder known as "Hot Vat Stripper" in mist, fume and vapor form. The injured worker alleges that these exposures required Mr. Gilbert's employer, American Hood Cleaning to provide him with respiratory protection.
The Staff Hearing Officer finds that "hot vat stripper" is mixed into a five gallon bucket of cold water using one and a half cups of hot vat stripper. Once mixed, the chemical is put into a sprayer. The Staff Hearing Officer finds that injured worker upon being hired in January 1998, was provided with Material Safety Data Sheets for chemicals used. The Staff Hearing Officer finds injured worker was trained and instructed on handling procedure by Dan Branigan, owner of American Hood Cleaning, per VSSR transcript pp. 43-45. The Staff Hearing Officer notes that Mr. Gilbert prior to working for American Hood Cleaning, performed a similar job working for another hood cleaning company, PK Pressure cleaning from May 1993 through September 1996. VSSR transcript pp. 42-43. The Staff Hearing Officer finds Mr. Branigan's training of Mr. Gilbert was short, given his past experience with hood and duct cleaning. VSSR transcript p. 45.
The Staff Hearing Officer finds that regulations of O.A.C. 4121:1-5-17(F)(1)(2) do not apply. The Staff Hearing Officer finds that air sampling performed by OSHA on September 24, 2001 confirms that there were not hazardous concentrations of dusts, fumes, mists, vapors or gases within the definition of" air contaminants" contained in O.A.C. 4121:1-5-01(B)(4) — OSHA Air Sampling Results — Kennings Circle K. Restaurant. The Staff Hearing Officer finds "air contaminants" as defined under O.A.C. 4121:1-5-01 were not found to be present.
The Staff Hearing Officer finds that the employer complied with the specific safety requirement, O.A.C. 4121:1-5-17(F)(1)(2). The Staff Hearing Officer finds that evidence presented does not
establish that the proximate cause of injured worker's injuries was employer's non-compliance with O.A.C. 4121:1-5-17(F)(1)(2) as alleged by injured worker. The Staff Hearing Officer finds employer was not in violation of O.A.C. 4121:1-5-17(F)(1)(2).
This order is based on investigation report, American Hood Cleaning Inc. employee handbook, transcript of VSSR hearing and letter from OSHA dated 10/22/2001 Mr. Murphy Area Director.
(Emphasis sic.)
 {¶ 53} 37. On January 7, 2005, relator moved for rehearing pursuant to Ohio Adm. Code 4121-3-20(C).
 {¶ 54} 38. In support of rehearing, on February 18, 2005, relator filed the affidavit of John Brady, which was executed February 17, 2005.
 {¶ 55} 39. John Brady is relator's brother-in-law who was also employed by AHC during the time that OSHA conducted its investigation. In his 26 paragraph affidavit, Mr. Brady concludes at paragraph 18:
Having been present for OSHA's testing, I can state that the circumstances under which the testing was performed was not the same as those under which we typically worked. Therefore, the test results were likely far different than they would have been on an average work day.
At paragraph 25 of his affidavit, Mr. Brady states:
The reason that I did not testify at the hearing at all was because of my relationships with both parties. I am still employed with American Hood Cleaning and Harvey Gilbert is my father-in-law. I asked both parties to keep me out of the proceedings if possible so that I would not compromise my relationship with either one.
 {¶ 56} 40. On March 4, 2005, AHC filed the affidavit of Dan Branigan executed March 1, 2005. At paragraph four of the affidavit, Mr. Branigan avers:
Brady's allegations concerning safety equipment and the OSHA air sampling studies performed on September 24, 2001, as related in his affidavit of February 17, 2005 are false.
 {¶ 57} 41. On April 14, 2005, another SHO mailed an order denying rehearing. The SHO's order of April 14, 2005 explains:
It is hereby ordered that the motion for rehearing filed 01/24/2005 be denied. The Injured Worker has not submitted any new and relevant evidence, which by due diligence could not have been obtained prior to the merit hearing, nor shown that the order of 10/14/2004 was based on an obvious mistake of fact or on a clear mistake of law.
The Staff Hearing Officer does not find an obvious mistake of fact or a clear mistake of law. This Staff Hearing Officer finds that the 09/24/2001 OSHA report is evidence related to hazardous concentrations of dust, fumes, etc. This Staff Hearing Officer finds no obvious mistake of fact related to that OSHA report.
This Staff Hearing Officer also finds no clear mistake of law. The VSSR Staff Hearing Officer relied on the OSHA report to find the requirements of O.A.C. 4121:1-5-01(B)(4) are not met. The VSSR Staff Hearing Officer further found no violation of O.A.C. 4121:1-5-17(F)(1)(2) because the requirements of O.A.C. 4121:1-5-01(B)(4) are not met. This Staff Hearing Officer finds no clear mistake of law based on the VSSR Staff Hearing Officer analysis.
This Staff Hearing Officer further finds that the affidavit of John Brady could have been obtained prior to the merit hearing had due diligence been exercised. No explanation has been provided that explains why Mr. Brady's testimony could not have been obtained prior to hearing, especially since Mr. Brady is the injured worker's son-in-law and a current employee of the instant employer.
 {¶ 58} 42. On July 25, 2005, relator, Harvey Gilbert, filed this mandamus action.
Conclusions of Law:
 {¶ 59} It is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 60} Ohio Administrative Code Chapter 4123:1-5 sets forth specific safety requirements for workshops and factories.
 {¶ 61} Ohio Adm. Code 4123:1-5-17 is captioned: "Personal protective equipment."
 {¶ 62} Ohio Adm. Code 4123:1-5-17(F)(1) and (2) state:
(F) Respiratory protection.
(1) Where there are air contaminants as defined in rule 4121:1-5-01 of the Administrative Code, the employer shall provide respiratory equipment approved for the hazard. It shall be the responsibility of the employee to use the respirator or respiratory equipment provided by the employer, guard it against damage and report any malfunction to the employer. Note: See appendix to this rule for basic guides for the selection of respirators.
(2) This requirement does not apply where an effective exhaust system (see rules 4121:1-5-18 and 4121:1-5-992 of the Administrative Code) or where other means of equal or greater protection have been provided.
 {¶ 63} Ohio Adm. Code 4123:1-5-01(B) sets forth definitions applicable to the safety rule set forth in Chapter 4123:1-5.
 {¶ 64} Ohio Adm. Code 4123:1-5-01(B)(4) states:
"Air contaminants": hazardous concentrations of fibrosis-producing or toxic dusts, toxic fumes, toxic mists, toxic vapors, or toxic gases, or any combination of them when suspended in the atmosphere.
 {¶ 65} Ohio Adm. Code 4123:1-5-01(B)(74) states:
"Hazardous concentrations (as applied to air contaminants)": concentrations which are known to be in excess of those which would not normally result in injury to an employee's health.
 {¶ 66} Relator's testimony as to how he performed the job was dramatically different from Mr. Branigan's testimony as to how the job should be performed. At one point, Mr. Branigan testified that you would have to be "an idiot" to perform the job in the manner that relator testified that he performed the job. The inference to be drawn from Mr. Branigan's statement is that his employee would most assuredly be exposed to a hazardous concentration of Hot Vat Stripper if the employee performed the job without respiratory equipment in the manner in which relator testified that he performed the job. The commission never determined the credibility of relator's testimony as to how he typically performed his job.
 {¶ 67} It is undisputed that AHC did not provide respiratory equipment to relator prior to his evaluation by Dr. Ghory on July 13, 2001. (Stipulation at 78.) Thereafter, Dr. Middaugh informed Mr. Branigan that relator must be provided "an ambient supplied air, fully hooded respirator." (Stipulation at 85.) Apparently, Mr. Branigan complied with the requests of Drs. Ghory and Middaugh for respiratory equipment.
 {¶ 68} Obviously, if Dr. Middaugh's diagnosis of restrictive lung disease is correct, the injurious exposure had to have occurred prior to Dr. Middaugh's evaluation when respiratory equipment was undisputedly not provided to relator by AHC.
 {¶ 69} At this point, it is important to analyze the definitions applicable to the specific safety rule at issue.
 {¶ 70} The safety rule at issue, Ohio Adm. Code4123:1-5-17(F)(1) and (2) requires that the employer provide respiratory equipment "where there are air contaminants." "Air contaminants" are defined as "hazardous concentrations" of toxic materials when suspended in the atmosphere. In turn, "hazardous concentrations," as applied to air contaminants, is defined as "concentrations which are known to be in excess of those which would not normally result in injury to an employee's health." (Emphasis added.)
 {¶ 71} Thus, the definition of "hazardous concentrations" imparts a requirement into the safety rule that it must beknown that the concentrations are in excess of those which would not normally result in injury to an employee's health. SeeState ex rel. Supreme Bumpers, Inc. v. Indus. Comm.,98 Ohio St.3d 134, 2002-Ohio-7089.
 {¶ 72} Contrary to relator's contention here, that the industrial claim is allowed for a respiratory condition that was caused by an injurious exposure to fumes or vapors does not automatically show the occurrence of hazardous concentrationsknown to be in excess of those which would not normally result in injury to an employee's health.
 {¶ 73} Whether the atmospheric or air concentrations of the Hot Vat Stripper where the employee works was known by the employer to be in excess of those which would not normally result in injury to the employee's health was an element to be proven by relator and was the key issue before the commission.
 {¶ 74} The OSHA air sampling results show the atmospheric concentrations to which AHC employees were exposed on September 24, 2001, while cleaning at the Kennings Circle K Restaurant. The OSHA air sampling results are relevant to Mr. Branigan's knowledge of the concentrations to which relator was actually exposed prior to his diagnosis only to the extent that it can be shown that the employees performing the cleaning on September 24, 2001 were performing in a manner consistent with the way that Mr. Branigan reasonably believed that relator typically performed his job for AHC. Contrary to relator's contention here, that the OSHA testing was conducted after relator received his injurious exposure, does not automatically disqualify the evidentiary value of the OSHA testing results.
 {¶ 75} Significantly, the SHO who heard the VSSR application on October 14, 2004, fails to cite to Ohio Adm. Code4123:1-5-01(B)(74) which defines "hazardous concentrations" and imparts the employer knowledge requirement into the safety rule.
The SHO's order again states in part:
The Staff Hearing Officer finds that regulation of O.A.C. 4121:1-5-17(F)(1)(2) do not apply. The Staff Hearing Officer finds that air sampling performed by OSHA on September 24, 2001 confirms that there were not hazardous concentrations of dusts, fumes, mists, vapors or gases within the definition of" air contaminants" contained in O.A.C. 4121:1-5-01(B)(4)[.] * * *
(Emphasis sic.)
 {¶ 76} The SHO's finding regarding the OSHA air sampling is incomplete. The SHO failed to explain how the OSHA air sampling results relate to what Mr. Branigan may have known about the concentrations to which relator would be exposed in the performance of his job.
 {¶ 77} Moreover, the SHO order of October 14, 2004, fails to address the key issue before the commission — whether it was known to the employer that the air concentrations of the Hot Vat Stripper where relator typically worked were in excess of those which would not normally result in injury. This was an abuse of discretion.
 {¶ 78} It should be further noted that employee negligence is ordinarily not a defense to a VSSR. State ex rel. Quality TowerServ., Inc. v. Indus. Comm. (2000), 88 Ohio St.3d 190. The employer avoids VSSR liability when the employee unilaterally violates a safety requirement, that is, when the employee removes or ignores equipment or instruction that complies with a specific safety requirement. Id. Thus, that relator may have deviated from the training he received does not necessarily absolve the employer of VSSR liability because specific safety rules are designed to protect employees against their own negligence and folly. Id.
 {¶ 79} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its order denying relator's VSSR application, and in a manner consistent with this magistrate's decision, enter an order either granting or denying the VSSR application.