[Cite as *State ex rel. DeMarco v. Indus. Comm.*, 2021-Ohio-1937.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Christian M. DeMarco, | : | |
| Relator, | : | |
| v. | : | No. 19AP-227 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

D E C I S I O N

Rendered on June 8, 2021

**On brief:** *Nager, Romaine, & Schneiberg Co., LPA, Jerald A. Schneiberg,* and *Catherine Lietzke,* for relator.

**On brief:** *Dave Yost*, Attorney General, and *Andrew J. Alatis,* for respondent Industrial Commission of Ohio.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

LUPER SCHUSTER, J.

{¶ 1} Relator, Christian M. DeMarco, initiated this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to reconsider its denial of DeMarco's application for an award of additional benefits based on a violation of a specific safety requirement ("VSSR") by respondent, Heritage Steel Services, Inc. ("Heritage"), DeMarco's former employer.

{¶ 2} This matter was referred to a magistrate of this court pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued the appended decision, including findings of fact and conclusions of law. The magistrate determined that the commission abused its discretion because its order denying DeMarco's

VSSR application is not supported by some evidence. Thus, the magistrate recommends this court grant DeMarco's request for a writ of mandamus.

{¶ 3} The commission has filed objections to the magistrate's decision, arguing that the magistrate improperly reweighed the evidence and erroneously concluded that the commission's denial of DeMarco's VSSR application is not supported by some evidence. We agree.

{¶ 4} For this court to issue the requested writ of mandamus, DeMarco must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). But when the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). The commission "has substantial leeway in both interpreting and drawing inferences from the evidence before it." *State ex rel. Lawson v. Mondie Forge*, 104 Ohio St.3d 39, 2004-Ohio-6086, ¶ 34. Thus, we must not "second-guess the commission's evaluation of the evidence." *State ex rel. Black v. Indus. Comm.*, 137 Ohio St.3d 75, 2013-Ohio-4550, ¶ 22.

{¶ 5} DeMarco, an ironworker, accidentally fell over 40 feet to the ground as he was connecting steel beams during the construction of a building for NASA in Cleveland. He was awarded workers' compensation benefits for his injuries resulting from the fall. The dispute in this matter centers on the commission's denial of DeMarco's application for an additional award for an alleged VSSR. *See State ex rel. Precision Steel Servs., Inc. v. Indus. Comm.*, 145 Ohio St.3d 76, 2015-Ohio-4798, ¶ 15, quoting *State ex rel. Newman v. Indus. Comm.*, 77 Ohio St.3d 271, 272 (1997) ("An award for a VSSR is 'a new, separate, and distinct award' over and above standard workers' compensation benefits.").

{¶ 6} In applying for a VSSR award, the claimant must establish that an applicable and specific safety requirement exists, which was in effect at the time of the injury, that the employer failed to comply with the requirement, and the failure to comply was the cause of the injury in question. *State ex rel. Trydle v. Indus. Comm.*, 32 Ohio St.2d 257 (1972); Ohio

Adm.Code 4121-3-20. The interpretation of a specific safety requirement is within the final jurisdiction of the commission. *State ex rel. Berry v. Indus. Comm.*, 4 Ohio St.3d 193 (1983). Because a VSSR award is a penalty, it must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer. *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170 (1989).

{¶ 7} DeMarco alleges his employer, Heritage, violated Ohio Adm.Code 4123:1-3-03(J)(1), which states:

> Lifelines, body belts or harnesses and lanyards shall be provided by the employer, and it shall be the responsibility of the employee to wear such equipment when exposed to hazards of falling where the operation being performed is more than six feet above ground or above a floor or platform, except as otherwise specified in this chapter, and when required to work on stored material in silos, hoppers, tanks, and similar storage areas. Lifelines and body belts or harnesses shall be securely fastened to the structure and shall sustain a static load of no less than three thousand pounds.

{¶ 8} Before the commission, DeMarco and Heritage disputed whether Heritage afforded to DeMarco the ability to securely attach the safety harness he was wearing to the structure as he worked to connect steel beams at a hazardous height. Based on the evidence presented, the commission determined that Heritage proved it had provided the equipment necessary for DeMarco to securely attach himself to the structure, and therefore concluded that Heritage met the requirements of Ohio Adm.Code 4123:1-3-03(J)(1). Consequently, the commission denied the VSSR application.

{¶ 9} In his decision, the magistrate correctly noted that the presence and quality of certain apparatuses at the construction site, namely beamers, chokers, and bridge clamps, were in genuine dispute before the commission. DeMarco and Darren Peters, who was working near DeMarco at the time of the fall, testified that these appliances were either not present or of improper quality. Other testimony challenged this. For example, Michael Connell, an ironworker who was the foreman at the construction site, testified extensively regarding the equipment available to DeMarco. This included testimony that good condition beamers, tie-off chokers, and bridge clamps were available for use at the

construction site. Thus, we agree with the magistrate's determination that there is some evidence in the record to support the commission's finding that these appliances were present and available for use at the construction site. However, the magistrate also concluded there is no evidence to support the commission's finding that the beamers, chokers, and bridge clamps could provide reliable and legal attachment points under the conditions at the time DeMarco fell. We disagree with this conclusion.

{¶ 10} DeMarco effectively conceded before the magistrate that the presence of beamers, bridge clamps, and tie-off chokers at the construction site would have constituted adequate equipment to safely secure himself to the structure. He argued that while the evidence demonstrated that harnesses, lanyards, and beamers were available for his use at the construction site, additional, but unavailable, equipment was necessary for him to securely connect to the structure. As to the latter, DeMarco asserted a "bridge clamp could have been used to prevent the beamer from slipping off, but these were not on the job according to Darren Peters and Relator." (DeMarco Brief at 7.) He added, "[s]imilarly the chockers [also referred to as chokers] which employer claims were at the accident location were not tie off chockers and therefore not able to tie off to the structure as required by the code." (DeMarco Brief at 7.) Thus, instead of arguing the adequacy of these appliances, DeMarco argued that the evidence clearly demonstrated that neither bridge clamps nor tie-off chokers were available for his use. As the magistrate noted, however, some evidence in the record demonstrated the presence of these appliances at the construction site. Further, even if DeMarco did not make such a concession, we disagree with the magistrate's conclusion that there is no evidence to support a finding that the presence of these appliances at the construction site met the safety requirements of Ohio Adm.Code 4123:1-3-03(J)(1).

{¶ 11} The magistrate characterized foreman Connell's testimony on the issue of the "adequacy of [the available] equipment under applicable safety standards" as "ambivalent" and lacking any "definite opinion." (App'x at ¶ 56.) We agree Connell's testimony was to some degree uncertain regarding whether the equipment on site was adequate to enable DeMarco to secure himself to the structure as he worked to connect steel beams. Connell testified in part that DeMarco could have securely attached himself to a beamer on the steel beam on which he was working, and then used a bridge clamp to keep the beamer from

possibly sliding toward the unattached end of that beam. But Connell also added that such an approach, while effective, was not typically done. The magistrate reasoned that because Connell's testimony was not sufficiently definitive as to the adequacy of the available equipment, it could not constitute some evidence upon which the commission could rely to find no VSSR violation. However, even if Connell's testimony was not some evidence upon which the commission could rely to find Heritage complied with the safety rule at issue, other testimony before the commission reasonably demonstrated the equipment on site was sufficient to allow DeMarco to safely secure himself to the structure.

{¶ 12} Heritage's owner, Jerry Vitanza, a long-time ironworker who frequently visited the construction site, testified that there were multiple ways DeMarco could have secured himself to the structure at the time of his fall. For example, Vitanza testified that DeMarco could have latched himself to the structure by looping his lanyard through a hole in the steel column to which he was attempting to attach the beam. He further indicated that DeMarco could have secured himself to the structure if he tied to a beamer or a tie-off choker, while also using a bridge clamp to preclude either from sliding off the steel beam that was yet to be connected at one end. Thus, according to Vitanza's testimony, DeMarco had at least one, if not multiple, means available to safely secure himself to the structure as he worked to connect the steel beams. This testimony constituted some evidence upon which the commission could rely to find Heritage did not violate Ohio Adm.Code 4123:1-3-03(J)(1).

{¶ 13} Following our independent review of the record pursuant to Civ.R. 53, we find the magistrate erred in determining that DeMarco is entitled to the requested writ of mandamus. We concur in the magistrate's recitation of the facts, and we supplement those facts as we have deemed appropriate. We disagree, however, with the magistrate's conclusions of law. Accordingly, we adopt the magistrate's findings of fact, as amplified herein, but not his conclusions of law. We therefore sustain the commission's objections to the magistrate's decision and deny DeMarco's request for a writ of mandamus.

*Objections sustained;*
*writ of mandamus denied.*

BROWN and KLATT, JJ., concur.

_____

**APPENDIX**

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Christian M. Demarco,      :

       Relator,                  :

v.                                :            No.  19AP-227

Industrial Commission of Ohio et al.,    :         (REGULAR CALENDAR)

       Respondents.          :

---

M A G I S T R A T E ' S   D E C I S I O N

Rendered on November 18, 2020

---

*Nager, Romaine, & Schneiberg Co., LPA, Jerald A. Schneiberg,* and *Catherine Lietzke,* for relator.

*Dave Yost*, Attorney General, and *Eric J. Tarbox,* for respondent Industrial Commission of Ohio.

---

IN MANDAMUS

{¶ 14} Relator, Christian M. Demarco, brings this original action seeking a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to remand relator's previously denied application for an award of additional benefits based upon a violation of a specific safety requirement ("VSSR") by respondent Heritage Steel Services, Inc., relator's former employer.

Findings of Fact:

{¶ 15} 1. Relator suffered severe injuries on May 24, 2011 in the course of and arising out of his employment with Heritage.

{¶ 16} 2. Relator fell approximately 42 or 47 feet, accounts differ, while connecting steel beams during erection of a new building.

{¶ 17} 3. Respondent allowed relator's claim for multiple severe conditions:

> This claim has been allowed for: Traumatic brain injury; closed fracture of nasal bone; closed fracture of right orbital floor; closed fracture malar/maxillary; closed fracture right three ribs; closed fracture left six ribs; closed fracture of sternum; effusion except tuberculous; closed fracture right scapula, glenoid cavity/neck; closed fracture left pubis; fracture left L5 transverse process; closed fracture sacrum/coccyx; closed right kidney laceration; closed liver laceration; closed fracture right lower radius with ulna; closed right traumatic pneumothorax; closed left traumatic pneumothorax; right suprascapular nerve injury; substantial aggravation lumbar facet arthropathy L3-4, L4-5, L5-S1; thoracic sprain/strain grade 2; chronic sprain/-strain of ribs.

{¶ 18} 4. Relator then filed an application for an additional award based on his employer's violation of a VSSR. After initially citing multiple sections, relator refined his application to violations under Ohio Adm.Code 4123:1-3-03(J)(1).

{¶ 19} 5. Relator's VSSR application is based upon the employer's failure to provide appropriate safety equipment with which he could tie off his harness securely to the structure while undertaking work at height. A pertinent part of Ohio Adm.Code 4123:1-3-03(J)(1) states: "Lifelines and body belts or harnesses shall be securely fastened to the structure."

{¶ 20} 6. A staff hearing officer ("SHO") denied the VSSR application on July 7, 2016, finding there were appropriate devices available with which relator could have tied-off to the building structure, had he chosen to do so. The SHO noted that Ohio Adm.Code 4123:1-3-03(J)(1) further states:

> Lifelines, body belts or harnesses and lanyards shall be provided by the employer, and it shall be the responsibility of the employee to wear such equipment when exposed to hazards of falling where the operation being performed is more than six feet above ground or above a floor or platform.

{¶ 21} The SHO further noted in her report:

> It is undisputed that the Injured Worker was wearing a fall protection arrest harness and a bridge belt which were his own which is common in the industry for iron workers to provide their own personal harnesses. * * * However, the Injured Worker was not tied off/secured at the time of the fall.

{¶ 22} The SHO concluded that, despite relator's testimony that his employer had not furnished anchoring equipment with which relator could tie off his harness's safety lanyard to a secure part of the structure, Heritage presented evidence that this equipment was on the job site and available to relator. The SHO determined that the employer had provided beamers, chokers, and bridge clamps, and that these were suitable for tying of on an unconnected beam. The SHO further concluded that Heritage had established by a preponderance of the evidence that the equipment required by Ohio Adm.Code 4123:1-3-03(J)(1) was provided and there was no VSSR violation.

{¶ 23} 7. The commission denied rehearing by order dated September 1, 2016.

{¶ 24} 8. Relator filed his complaint for mandamus with this court on April 15, 2019.

{¶ 25} 9. The uncontested aspects of the evidence establish that relator was an experienced ironworker with a preference for working as a "connector," which involves the initial connection of steel beams and columns for each incremental increase in height in a new building structure. On the day of his accident, relator was working to connect beams to column tops on the fourth floor of a new structure built for NASA. A crane hoisted the new beams into position under the guidance of the connector team, who used hand signals and radios to communicate with the crane operator. Workers setting beams on the perimeter of the building and above 30 feet were required under Occupational Health and Safety Administration ("OSHA") regulations to tie-off. Workers at lower heights or situated away from the perimeter, and therefore above completed floor decking, had less stringent safety requirements.

{¶ 26} 10. The NASA building skeleton was prematurely braced in a manner that put the highest row of columns out of plumb and locked them in place. This displaced or misaligned the column tops where relator would make his connections with beams brought up by crane. The locked-in distortion at the top of the structure made the connections difficult to achieve when new elements were added.

{¶ 27} 11. Equipment needed by the connection team, including safety appliances, was placed on the third-floor deck, one level below the connection site.  The connection team secured a ladder on this deck to the first column where a connection would be made, and thereafter worked along the tops of the new beams as they were added. Moving the ladder from column to column as work progressed was considered neither efficient nor secure, because the corrugated steel deck surface made placement of the foot of the ladder difficult, and safe work practices required that the ladder be attached to a column at each move.  Workers exerting force to align a connection could not safely do so from a position on the ladder.

{¶ 28} 12. Relator was working to make a connection at the free end of a horizontal beam that was already connected at the other end to a column and suspended in the middle from the crane cable.  The connection was extremely tight because of the poor column alignment. Despite this, relator felt he could still make the connection by prying the beam end and communicating with the crane operator to request movements.

{¶ 29} 13. All witnesses agreed that optimum attachment of safety lines to beams that have one or both ends unconnected to the building structure must be made with different appliances than when tying off the worker to a beam attached at both ends. Testimony differed on whether certain methods were prohibited or merely inadvisable.

{¶ 30} 14. Relator's partner in the two-person connector team was Darren Peters. Peters was securely tied off using available appliances to another beam nearby, which was connected at both ends.

{¶ 31} 15. Relator was not tied off and fell to the outside of the building skeleton while attempting to lever the beam end into place for connection.

{¶ 32} 16. Three types of portable appliances used by ironworkers are discussed in the record: "chokers" (in some documents spelled "chockers"), "beamers," and "bridge clamps." Chokers are essentially a loop of cable which, when placed around a beam, provide a secure point to anchor a worker's own safety lanyard, which is attached to the worker's harness.  Aside from safety attachment, chokers serve other purposes such as lifting attachments for beams raised to the work level by crane.  "Beamers" are metal devices that fit around the top flange of a beam and provide an attachment point.  Both chokers and beamers may slide to allow travel along the beam as the worker moves.  For

this reason, neither is suited for use on a beam that is not secured at both ends (a "floating" beam)—the worker's attachment point might simply slide off the end of the beam during a fall. Bridge clamps are not safety equipment per se, but are clamped to a beam or column for various purposes during construction.

{¶ 33} 17. Relator testified at length before the SHO. He stated that he had complained to Michael Connell, Heritage's foreman on the site, that there was no place to tie off on floating beams. (R. 472.) Relator felt the situation called for a system of stanchions and cables attached to the new beams before they were sent up, or welded flanges and attachment points on the beams, or holes drilled in beams. (R. 474, 482.) When relator pushed Connell on the lack of tie-off points, Connell told him to give the appearance of tying off in places where he could not actually do so, in order to avoid exposing Heritage to workplace safety fines.

{¶ 34} Relator noted that some beams might incorporate as part of their structural connection point a lug or flange on the end that would prevent a beamer from sliding off a floating beam, but those going up on the NASA building were not so shaped. (R. 487-88.) Relator also noted that beams with certain cross-sections or profiles would not accommodate a beamer, but those he worked with on the day of the accident presented no such impediment. During testimony, relator vigorously rejected counsel's suggestion that a bridge clamp could be used to provide an anchor or stop for a beamer to keep it from sliding. Relator stated that this was not accepted practice, and moreover Federal OSHA rules required that 5000 pounds of torque be applied to a bridge clamp when so used, which was beyond the strength of an individual worker to apply. (R. 474, 487.) Relator recalled that any chokers present on the third-floor deck were not suitable for tie-off, because they had been used for other construction purposes and were therefore no longer legal as safety appliances, which must be "pristine." (R. 488.) He did not recall any beamers present on the deck. (R. 479.) Even if appropriate chokers and beamers had been available on the deck, they would not have solved his tie-off needs for work on a floating beam. (R. 488.) Relator cited OSHA regulations under "Subpart R" as governing the NASA job site, although he inferred that NASA may have had additional workplace rules in effect.

{¶ 35} 18. Darren Peters presented testimony that corroborated that of relator regarding the safety situation on the NASA job. He agreed that they had approached Connell about the lack of attachment points, and that Heritage rejected his suggestion of welding clips or stanchions on beams before they were sent up. The company refused the use of bucket lifts or personnel baskets raised to working height from vehicles at ground level, stating that the bare ground around the building had not been evaluated and rated to support the equipment; nonetheless, after relator's fall, Heritage or its successor on the job did provide this equipment.

{¶ 36} Peters was tied off while working using his own "rat tail," a lightweight, plastic-coated choker specifically designed for personal safety use. This use of a choker was legal because he was tied off to the previously-set beam, which was connected at both ends.  In 11 years of work, he had never seen a bridge clamp used to secure a choker or beamer as a safety anchor. (R. 495.) He agreed that this was at least theoretically possible, but insisted that it was against OSHA regulations. (R. 500.)

{¶ 37} When confronted with his prior statement obtained earlier in the investigation, Peters agreed that beamers were at the very least available in the "gang box" at ground level, and Connell had instructed the ironworkers to use them. (R. 493-94.) He corroborated relator's assertion that Connell told them both to give the appearance of tying off in places where they could not actually do so.

{¶ 38} 19. Michael Connell testified that chokers and bridge clamps were on the third-floor deck below relator's work location, and the chokers were new.  Beamers were also available in the gang box. Connell testified that he recalled no complaints from relator or Peters regarding safety standards.  He denied telling the connector crew to simulate tie-offs when it was not possible to do so properly. Presented with photographs of the work area taken shortly after relator's accident, he identified beamers, chokers, and bridge clamps on the third-floor deck. As far as the use of bridge clamps to secure beamers and chokers on a floating beam, and the presence of these items on the third-floor deck, Connell testified as follows:

> Q.  Let me ask you this:  Is it allowable to use a bridge clamp to tie off?
>
> A.  By practice, it isn't.

Q. It isn't?

A. But --

Q. You've seen people do it?

MR. LENEGHAN: Let him answer.

Q. Oh, go ahead.

A. There's spots where sometimes that's all you can use. And that's better than nothing.

Q. Would a bridge clamp hold someone if they're falling off?

A. Yes, a bridge clamp will hold a big beam with a plate clamped on there the weight of a beam.

Q. But that's not the practice?

A. No, but if it's the only thing that you should use, it will hold you.

Q. Okay. What about using a beamer on a floating beam, is that acceptable?

A. Yes.

Q. Okay.

A. One end is connected, it ain't a floating beam.

Q. Well, it's floating on one end?

A. Yes.

Q. Right.

A. That ain't a floating people though.

Q. Well, the one end is floating?

A. Yes.

Q.  Is it allowable or practice-wise, is it allowable to use a beamer on a beam that isn't connected on both ends?  Let me ask you that way.

A.  You're not even supposed to be on the beam if it ain't connected on one end.

Q.  No, maybe you misunderstood what I said.  If the beam is not connected on both ends, let's say it's connected on one end, but not on the other end?

A.  Yes.

Q.  Is it permissible to use a beamer?

A.  Yes.

Q.  It is?

A.  Yes, it is.

Q.  What prevents it from falling, sliding right off the beam?

A.  You can use the bridge clamp to clamp it down. When you walk across, that rid has got that beam. That beam isn't going - - it might come down a little bit, but it ain't going to be enough unless it comes out and you're by your column and stuff, the only way that beamer is going to come off is if that beam is laying way down.

Q.  Okay.

A.  That beam maybe will come down six inches from his weight.

Q.  Let's assume for a minute that that beam is way down. Would it be proper to use a beamer if that beam is way down?

A.  It's not going to be way down because your rig - -

Q.  Just - -

A.  Common sense.

HEARING OFFICER: Mr. Connell, can you just take a picture and listen to the complete question that Mr. Canda asked you and keep your answer specifically to the question.

THE WITNESS: Okay.

Q. Humor me, Mr. Connell.

MR. LENEGHAN: Objection to that.

Q. I mean, I'm asking you if the beam is at such an angle that you called it way down, would it be proper to use a beamer on a beam that has an angle like that?

A. Them beamers will cock their self and grab. Now, there is a chance of it slipping off.

Q. Okay.

A. But they cock their selves and they will grab, too.

Q. Okay. So can we agree that it may not be the best way to tie off if you have a beam that is leaning, it would be not the best way to tie off with a beamer because it could slide right off?

A. Right. You shouldn't even be on that beam if it's laying down that far. By practice, you bring that beam up even, right where you're supposed to be and then you go across it.

Q. By practice, do you use a bridge clamp to secure a beamer in any way?

A. You can put it - - once you get to your spot, you can put that bridge clamp in front of that beamer and then it's not going nowhere.

Q. Is that allowable?

A. Yes.

Q. That's not illegal?

A. No, that's --

Q. That's not against OSHA regulation?

A.  That bridge clamp isn't going nowhere.

Q.  That's not against OSHA regulation?

A.  Not that I know of.

Q.  Not that you know of?

A.  Not that I know of.

MR. CANDA:  All right.  I'm going to turn it over to Ms. Lietzke?

* * *

Q.  These are pictures taken by NASA afterwards. Do you see beamers in this picture?

A.  Yes. Let me see that again.

Q.  Can you identify the beamers?

A.  Yes.  Those are the beamers and them are the chokers. I don't know if that's a clamp in that bucket or not, it's hard to - -

MR. CANDA:  Is that the same picture we saw before?

* * *

BY MR. LENEGHAN:

Q.  Can you point to what you identify as the beamer?

A.  These are the beamers.

Q.  Is there more than one?

A.  Yes, there's three.

Q.  There's one, two, three?

A.  There's three of them.

HEARING OFFICER:  Okay.

Q.  What is in the bucket?

A.  That might be a clamp. I'm not sure. It's hard to tell.

Q.  What is this wire over here?

A.  Them are chokers. See the red tag on that?  That's a choker tag.

Q.  Now, when you say "choker", is this a lifting choker or is it a tie off choker?

A.  We were using them as tie-off chokers, because we haven't used them for nothing else.

Q.  Okay.  So what you're saying is the picture here is showing a tie-off choker that had never been used as a lifting choker?

A.  Yes.

Q.  And did Heritage Steel have brand-new tie-off chokers on this job before the accident?

A.  Yes.  Well, we were using them chokers for the tie-off chokers.

* * *

BY MR. CANDA:

Q.  Do you use bridge clamps to stop a beamer?

A.  No, not theoretically. I agree with what Mike says, you know, it's not typical, but it's a means - - it's a means to an end.

(R. 510-12.)

{¶ 39} 20.  Two other members of the construction crew presented evidence: Michael Nyzda and Thomas Langel.  The two were working as the ground crew on the day of the accident, preparing and sending up beams for connection by relator and Peters. Later, both were tasked with removing the partially-connected beam after relator's fall. As a result, both stated that they were able to observe the equipment found on the third-floor deck.  Both recalled seeing beamers, chokers, and a bridge clamp.

{¶ 40} 21. Langel also gave testimony via deposition for a related civil case, and his deposition is in the record here. In that testimony, Langel emphasized that neither a beamer nor a choker can be used on a beam with a disconnected end. (R. 264-65.) He stated that the safe and legal method of tying off would be a system of stanchions and cables rigged on the beams before they were sent up for connection. (R. 265-66.) Bridge clamps were not suitable as safety anchors either for setting safety cables or preventing a beamer from sliding off the beam end. (R. 278-79, 286, 293, 295), and he had never seen this done in his career as an ironworker. He conceded that such an arrangement, if not legal under OSHA regulations, was nonetheless better than no tie-off at all. (R. 295.)

{¶ 41} 22. Jerry Vitanza, owner of Heritage, testified at the hearing before the SHO that he was unable to access the job site to recover his equipment until June 16, 2011 (some seven weeks after the accident) to recover equipment. At that time, Heritage recovered bridge clamps, beamers, and tie-off chokers from the third-floor deck. Vitanza testified that Heritage had recently brought new tie-off chokers capable of maintaining the required minimum load of 5,000 pounds. Vitanza denied being approached by relator prior to the accident regarding safety deficiencies at the NASA site.

{¶ 42} 23. Heritage introduced a letter at the hearing giving the inventory of items picked up by Connell on June 16, 2011, listing bridge clamps, tie-off chokers, and other equipment. The letter is unsigned.

{¶ 43} 24. An OSHA investigation ensued from relator's fall. The contents of the investigation report, which resulted in citations for violations by Heritage, are in the stipulated record here. Citation 1, Item 1 of this report concludes that "Anchorage used for attachment for personal fall arrest equipment was not capable of supporting at least 5,000 pounds * * * per employee attached * * * during steel erection activities, the employer did not ensure that 3/8 inch chokers that were supplied for fall protection were capable of supporting 5,000 lbs." (R. 592.)

{¶ 44} 25. Citation 1, Item 2 of the OSHA report states that erectors working more than 15 feet above lower level were not "protected from fall hazards by guardrail systems, safety net systems, personal fall arrest systems, * * * or fall restraint systems." (R. 592.)

{¶ 45} 26. Citation 1, Item 3 of the OSHA report further states: "Each connector was not protected in accordance with paragraph (a)(1) of this section from fall hazards of more than two stories or 30 feet * * * above a lower level." (R. 593.)

{¶ 46} 27. The text of the OSHA regulations referred to by the witnesses does not appear in the record. The section given in the OSHA citation in relation to personal fall protection is 29 C.F.R. 1926.760(b)(1). This section then makes further reference to 29 C.F.R. 1926.502. The language of these and any potentially relevant appendices is not discussed in the commission's order.

Discussion and Conclusions of Law:

{¶ 47} Relator seeks a writ ordering the commission to remand his VSSR application for reconsideration by a hearing officer. To be entitled to this relief in mandamus, relator must demonstrate a clear legal right to the requested relief, a corresponding clear legal duty on the part of the commission, and the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Moore v. Malone,* 96 Ohio St.3d 417, 420, 2002-Ohio-4821, ¶ 20. A right to a writ of mandamus will lie only where the commission abused its discretion by entering an order not supported by any evidence in the record. *State ex rel. Taylor v. Indus. Comm.,* 150 Ohio App.3d 309, 2002-Ohio-6451, ¶ 21 (10th Dist.). This court will not find such an abuse of discretion where there is some evidence in the record to support the commission's finding. *State ex rel. Miller v. Indus. Comm.,* 10th Dist. No. 13AP-418, 2014-Ohio-1742, ¶ 9.

{¶ 48} A claimant seeking to establish a VSSR claim must prove that an applicable specific safety requirement was in effect at the time of injury, the employer failed to comply with that requirement, and the failure to comply was the proximate cause of the injury in question. *State ex rel. Scott v. Indus. Comm.,* 136 Ohio St.3d 92, 2013-Ohio-2445, ¶ 11. "It is well-settled that a VSSR award is deemed a penalty to the employer subject to the rule of strict construction with all reasonable doubts concerning the interpretation of the safety standard to be construed against the applicability of the standard to the employer." *State ex rel. Sunesis Constr. v. Indus. Comm.,* 10th Dist. No. 09AP-423, 2010-Ohio-4434, ¶ 40.

{¶ 49} Factual questions relevant to proof of a VSSR rest exclusively within the discretion of the commission. *State ex rel. Haines v. Indus. Comm.,* 29 Ohio St.2d 15, 17

(1972). This court in a mandamus action will review the commission's factual decisions on VSSR applications only for an abuse of discretion. *State ex rel. Ish v. Indus. Comm.*, 19 Ohio St.3d 28, 32 (1985).

{¶ 50} The question before this court is whether the commission abused its discretion when accepting certain evidence regarding the nature and quality of the tie-off equipment available to relator, where that evidence contradicted the direct testimony of relator and his work partner on the day of injury, Darren Peters.

{¶ 51} Respondent argues that the OSHA report and citations are not probative of a VSSR under Ohio law. This is partially correct. Violations of other regulations, such as OSHA standards, will not, by themselves, support a VSSR. *State ex rel. Richmond v. Indus. Comm.,* 139 Ohio St.3d 157, 2014-Ohio-1604, ¶ 19. Conversely, compliance with OSHA regulations will not preclude a VSSR award. *State ex rel. Danstar Builders, Inc. v. Indus. Comm.*, 10th Dist. No. 04AP-309, 2005-Ohio-365, ¶ 26, *aff'd*, 108 Ohio St.3d 315, 2006-Ohio-1060. However, neither line of cases invokes a bar against consideration of OSHA *findings* insofar as they may support a finding of a VSSR under Ohio law. This is qualitatively different than relying on an OSHA violation to support an Ohio violation; relying on OSHA *facts* to support or deny an Ohio violation is sound evidence for consideration. *Scott* at ¶ 31 (Denying VSSR application because OSHA air quality testing in workplace did not reveal hazardous levels of contaminants.).

{¶ 52} In addition, because VSSR definitions by themselves may lack sufficiently detailed descriptions of workplace conditions and requirements, the commission and courts have accepted and applied OSHA and industry standards when assessing a VSSR application: "[A]lthough the commission may not adopt external standards as the sole basis for a VSSR award, it may look to those standards as relevant factors to inform its interpretation of an SSR and its determination whether the employer violated that SSR." *Richmond* at ¶ 22. Consistently with this approach, the SHO order in this case states that the hearing officer's decision is made "after a review of all the evidence on file and adduced at the hearing and in consideration of industry standards." (R. 609.)

{¶ 53} The testimony regarding the presence of beamers, chokers, and bridge clamps in the work area was conflicting. Relator and Peters asserted that these appliances were absent or of improper quality. The other witnesses and some photographic evidence

suggest otherwise. There is therefore some evidence in the record to support the commission's conclusion that beamers, chokers, and bridge clamps were present on the third-floor deck if relator wished to avail himself of them.

{¶ 54} The mere presence of certain appliances, however, is not conclusive of relator's VSSR application because there is no evidence to support the commission's conclusion that the appliances in question could provide reliable and legal attachment points under the conditions at the time relator fell. Both relator and Peters testified at length regarding the application of chokers, bridge clamps, and beamers for tying off on a beam with one unsecured end. Both were detailed and specific in their explanation as to why the equipment available on the third-floor deck was not suitable for tying off to a floating beam. Both cited to OSHA regulations, Subpart R, to establish the need for other safeguards.

{¶ 55} In contrast, Connell testified without reference to OSHA or other regulations, other than to say that using a beamer on a floating beam was not against any OSHA requirement "that [he knew] of." (R. 511.) Connell stated that beamers *might* cock and grab on a floating beam when pulled by a fall, and thus not slide off the end of the beam. Although Connell felt that a bridge clamp used as a stop could secure a beamer, he qualified his belief: "I agree with what Mike says, you know, it's not typical, but it's a means - - it's a means to an end." (R. 512.)

{¶ 56} The magistrate considers that the commission has abused its discretion in accepting ambivalent testimony from individuals stating no definite opinion regarding the adequacy of that equipment under applicable safety standards. This did not constitute some evidence upon which the commission could base its decision. Having acknowledged the significance of industry standards, and thus pertinent OSHA regulations, in determining whether Heritage had violated Ohio Adm.Code 4123:1-3-03(J)(1) requirements that "[l]ifelines and body belts or harnesses shall be securely fastened to the structure," the commission abused its discretion when it did not consider the only clear evidence in this respect. The magistrate accordingly finds that the commission's order is not supported by some evidence.

{¶ 57} In sum, the presence or absence of beamers and chokers is irrelevant on the present facts because they would not have allowed relator to secure himself to the floating

beam upon which he was working. The only probative evidence before the hearing officer and commission was that presented by relator and Peters, establishing that the appropriate tie-off equipment was not available to relator at the time of his fall.  The magistrate therefore recommends that this court should issue the requested writ of mandamus ordering the commission to reconsider the matter relying on the appropriate evidence and fully articulating the applicable industry standards, including OSHA regulations.

                                        /S/ MAGISTRATE
                                        MARTIN L. DAVIS


                              **NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).