[Cite as *State ex rel. Culver v. Indus. Comm.*, 2024-Ohio-1138.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Sharmel J. Culver, | : | |
| Relator, | : | No. 22AP-292 |
| v. | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio et al., | : | |
| Respondents. | : | |

D E C I S I O N

Rendered on March 26, 2024

**On brief:** *Karp Steiger Co., L.P.A.*, and *David J. Steiger*, and *Flowers & Grube*, and *Louis E. Grube, Paul W. Flowers*, and *Melissa A. Ghrist*, for relator.

**On brief:** *Dave Yost,* Attorney General, and *Andrew J. Alatis*, for respondent Industrial Commission of Ohio.

**On brief:** *Zashin & Rich Co., LPA, Jeffrey J. Wedel*, and *Scott Coghlan*, for respondent TimkenSteel Corporation.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

EDELSTEIN, J.

{¶ 1} Relator, Sharmel Culver, seeks a writ of mandamus to compel respondent, the Industrial Commission of Ohio ("commission"), to vacate its January 13, 2022 order finding respondent Timkensteel Corporation ("Timkensteel") did not violate a specific safety requirement ("VSSR") at the time of her husband's death and denying her application for an additional award in the workers' compensation claim brought on her late husband's behalf.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a court magistrate. On August 18, 2023, the magistrate issued

a decision containing findings of fact and conclusions of law, which is appended hereto. Ms. Culver timely filed objections to the magistrate's decision and both the commission and the employer filed memoranda in opposition. Accordingly, we now independently review the magistrate's decision to ascertain whether "the magistrate has properly determined the factual issues and appropriately applied the law." Civ.R. 53(D)(4)(d).

## I. Background

{¶ 3} Ms. Culver's late husband, Kenneth Ray Jr., was employed by Timkensteel as a member of their fire and safety team. (May 17, 2022 Compl. at ¶ 5.) On the morning of March 20, 2016, Mr. Ray was assigned to inspect the fire extinguishers in the elevator control room at a Timkensteel plant. (*Id.* at ¶ 6.) The control room was sealed to prevent outside pollutants from settling onto the machinery and hindering the operation of the motors. (*Id.* at ¶ 7.) An air handling unit installed directly below provided the control room with clean air. The unit drew outside air into its filtration system and then circulated purified air into the room above. (Aug. 11, 2022 Stipulation of Evidence at 490.) To do so, it relied on a self-cleaning feature to knock external contaminants off its filter at regular intervals. (Compl. at ¶ 9.) When working properly, the cleaning system would use compressed nitrogen gas to shoot a puff of air at the filter for less than a second while circulation was momentarily paused. (*Id.* at ¶ 9-10.) The unit fans would then resume circulation of clean air into the elevator control room once the process was complete. (*Id.* at ¶ 9.) On the day of the deadly accident in this case, unbeknownst to Mr. Ray, the air handling unit had malfunctioned, causing the air handling unit's cleaning system to continuously release nitrogen into the room above. By the time Mr. Ray entered the sealed control room, the air inside contained 95 percent nitrogen and only 4.7 percent oxygen. (*Id.* at ¶ 11-13.) Air containing less than 19.5 percent oxygen is considered dangerous to breathe. (*Id.* at ¶ 14.) Therefore, the room contained less than a fourth of the amount of oxygen present under typical conditions and was dangerously insufficient. Due to the dangerously unsafe levels of oxygen in the elevator control room, Mr. Ray died of asphyxiation seconds after entering the room. (Stipulation at 491.)

{¶ 4} The oxygen levels were so depleted in the room that the employees who found Mr. Ray became sick upon entering the room to retrieve him. (*Id.* at 490.) Soon after the accident, Timkensteel discovered that the air handling unit had malfunctioned. (*Id.* at 491.)

While the cause of the malfunction is still unknown, Timkensteel acknowledged leaked nitrogen displaced the oxygen in the control room, and it is undisputed that these atmospheric conditions were responsible for Mr. Ray's death. (*Id*.)

{¶ 5} Following allowance of her death benefits claim, Ms. Culver applied for an additional award for VSSR. (Compl. at ¶ 21.) In the application, she alleged Timkensteel failed to comply with several relevant safety rules required by law, specifically: (1) Ohio Adm.Code 4123:1-5-17(F), requiring employers to provide respiratory protection equipment where air contaminants are present; (2) Ohio Adm.Code 4123:1-5-18(C), requiring employers to minimize employee exposure to air contaminants through at least one of six listed methods; and (3) Ohio Adm.Code 4123:1-5-22, requiring employers to implement protocols where employees must enter a "confined space." (Stipulation at 491.) The VSSR application was later amended to include an additional claim alleging that Timkensteel violated Ohio Adm.Code 4123:1-5-18(E)(2) through (4), which sets forth structural specifications for exhaust systems that may be used to minimize air contaminant exposure. (Compl. at ¶ 24.)

{¶ 6} At the hearing on the amended application, and prior to any discussion on the merits, Ms. Culver withdrew her claims alleging violations of Ohio Adm.Code 4123:1-5-22 and Ohio Adm.Code 4123:1-5-18(E)(2) through (4). (Stipulation at 491.) Consequently, the hearing proceeded only on the claims alleging violations of Ohio Adm.Code 4123:1-5-17(F) and Ohio Adm.Code 4123:1-5-18(C). (*Id*.) At the hearing, Ms. Culver alleged that two specific safety requirements applied to Mr. Ray's work duties at the time of his death and Timkensteel failed to comply with either, causing Mr. Ray's tragic death. First, she alleged that Timkensteel failed to provide acceptable respiratory equipment, an effective exhaust system, or equivalent or greater protection as mandated by former Ohio Adm.Code 4123:1-5-17(F)[1] where air contaminants are present. Second, she alleged Timkensteel did not

---

[1] An amended version of Ohio Adm.Code 4123:1-5-01(B)(4) went into effect on June 1, 2016. The amended rule, nearly identical to the version in effect at the time of publication, removed all references to "toxic" in its definition of "air contaminants." Regardless, the applicable safety requirements for purposes of VSSR awards are the version in effect on the date of the injury. *See State ex rel. DeMarco v. Indus. Comm.,* 10th Dist. No. 19AP-227, 2021-Ohio-1937, ¶ 6. Unless otherwise noted, all subsequent discussion will refer to this former version.

comply with its obligation under former Ohio Adm.Code 4123:1-5-18(C) to implement one of six approved methods for minimizing air contaminant exposure.

{¶ 7} In the order denying Ms. Culver's VSSR application, the state hearing officer ("SHO") noted that "air contaminants" was defined as "hazardous concentrations of fibrosis-producing or toxic dusts, toxic fumes, toxic mists, toxic vapors, or toxic gases, or any combination of them when suspended in the atmosphere" in the version of Ohio Adm.Code 4123:1-5-01(B)(4) in effect at the time of Mr. Ray's death. (Stipulation at 492-93.) Hazardous concentrations, in turn, are "concentrations of air contaminants which are known to be in excess of those which would not normally result in injury to an employee's health." Former Ohio Adm.Code 4123:1-5-01(B)(74).[2] Thus, the threshold question in this case is whether nitrogen gas is a "toxic gas." "Toxic" is not defined in former Ohio Adm.Code 4123:1-5-01.

{¶ 8} The evidence in the administrative record consisted of the report and hearing testimony of Ms. Culver's expert witness Dr. David Bizzak, scientific literature submitted by Dr. Bizzak, copies of Occupational Safety and Health Administration citations issued on April 8, 2020, several depositions, an internal Timkensteel manual about oxygen deficiency, and a notice of corrective action. (*See* Stipulation Index.)

{¶ 9} In his report, Dr. Bizzak stated that nitrogen "comprises 78 percent of the air that we breathe" and "is largely inert, nontoxic, and the average person may consider it to be harmless." (*Id.* at 378.) However, he explained that nitrogen "is dangerous because it can rapidly displace oxygen in the air such that the oxygen level falls below the level needed to sustain life." (*Id.*) The SHO relied on Dr. Bizzak's testimony, report, and supporting materials to conclude that nitrogen—as a "primary component of the air we breathe"—is not a "toxic gas." (*Id.* at 492.) In relevant part, the decision states:

> Rule 4123:1-5-17 (F) and rule 4123:1-5-01 (B) are clear. Air contaminants, for the purposes of this claim, are defined as toxic gases. No evidence has been presented to substantiate nitrogen gas is a toxic gas. The evidence presented by the Widow-Claimant expressly indicates nitrogen gas is not toxic.

---

[2] Similarly, Ohio Adm.Code 4123:1-5-01(B)(74) was amended on June 1, 2016 to its current iteration, which now defines hazardous concentrations as "concentrations of air contaminants which are in excess of established occupational exposure limits." Like previously noted, we are bound to apply the definition that was in effect at the time the injury occurred.

> As such, the cited rule is not applicable. * * * Similarly, [Ohio Adm.Code 4123:1-5-18(C)] deals with air contaminants, again defined by rule 4123:1-5-01 (B) (4). As nitrogen has not been established to be a toxic gas, this alleged violation of a specific safety requirement is not applicable.

(*Id.* at 492-93.)

{¶ 10} This mandamus action followed. On August 18, 2023, the magistrate issued a decision recommending we deny the requested writ. The magistrate concluded there was evidence in the record supporting the SHO's determination that nitrogen is not a toxic gas and therefore not an air contaminant—a required element of the safety regulations Ms. Culver alleged were violated in this case. (Aug. 18, 2023 Mag.'s Decision at 9.) Ms. Culver timely filed objections, which are now before us on review. She did not object to the factual findings in the decision, including the finding that " 'displacement of oxygen by nitrogen in the elevator motor room' caused [Mr. Ray] to perish." (Sept. 1, 2023 Objs. to Mag.'s Decision at 8-9, quoting Mag.'s Decision at 1.) Instead, Ms. Culver objects only to the magistrate's legal conclusion that "the nitrogen mixed with other gases that suffocated [Mr. Ray] did not meet the definition of 'air contaminants' [found] in Ohio Adm.Code 4123:1-5-01(B)(4)." (Objs. to Mag.'s Decision at 1.) Ms. Culver asserts that because nitrogen can kill a person in significant concentrations, it is rendered toxic by this unquestionably lethal property. (*Id.* at 10-11.) Both the commission and Timkensteel filed responses to the objections.

## II. Law and Analysis

{¶ 11} R.C. 4121.13 vests the authority to promulgate industry-specific safety standards in the Bureau of Workers' Compensation. *State ex rel. Jeep Corp. v. Indus. Comm.*, 42 Ohio St.3d 83, 84 (1989).

{¶ 12} "To be entitled to an additional award for a VSSR, a claimant must show that (1) a specific safety requirement applied, (2) the employer violated that requirement, and (3) the employer's violation caused the injury." *State ex rel. Precision Steel Servs. v. Indus. Comm.*, 145 Ohio St.3d 76, 2015-Ohio-4798, ¶ 15. "A writ of mandamus will lie when there is a legal basis to compel the commission to perform its duties under the law or when the commission has abused its discretion in carrying out its duties." *State ex rel. Levitin v.*

*Indus. Comm.*, __ Ohio St.3d __, 2023-Ohio-3559, ¶ 15. As the exclusive fact finder, questions regarding the weight and credibility of the evidence rest exclusively within the commission's discretion. *State ex rel. Armstrong Steel Erectors, Inc. v. Indus. Comm.,* 144 Ohio St.3d 243, 2015-Ohio-4525, ¶ 16.

{¶ 13} A safety requirement must be specific enough to plainly apprise an employer of its legal obligations to its employees. *State ex rel. Frank Brown & Sons, Inc. v. Indus. Comm.*, 37 Ohio St.3d 162 (1988). Because it is considered a penalty for the employer's conduct, "a safety standard 'must be strictly construed, and all reasonable doubts concerning the interpretation of the safety standard are to be construed against its applicability to the employer.' " *State ex rel. Strawser v. Indus. Comm.*, 10th Dist. No. 22AP-330, 2023-Ohio-4327, ¶ 18, quoting *State ex rel. Cassens Corp. v. Indus. Comm.,* 10th Dist. No. 21AP-93, 2022-Ohio-2936, ¶ 7. Nonetheless, "the application of the strict-construction rule cannot justify an illogical result or one that is contrary to the clear intention of the code." *State ex rel. Pennant Moldings, Inc. v. Indus. Comm.*, 10th Dist. No. 11AP-942, 2013-Ohio-3259, ¶ 16, citing *State ex rel. Maghie & Savage, Inc. v. Nobel*, 81 Ohio St.3d 328, 331 (1998).

{¶ 14} A VSSR claimant must first establish that a specific safety requirement applied in order to trigger its protections. *See Precision Steel Servs.* at ¶ 15. The parties do not dispute that the high levels of nitrogen gas present in the control room air caused Mr. Ray to asphyxiate, nor that under the definition of "air contaminant" in effect at the time of injury, the claimant was first required to establish the presence of a ***toxic*** gas. *See* former Ohio Adm.Code 4123:1-5-01(B)(4). The sole dispute is whether the commission abused its discretion when it determined nitrogen is not a toxic gas.

{¶ 15} In her objections, Ms. Culver asserts "there is no doubt about when and how nitrogen can quickly kill a person in significant concentrations." (Objs. to Mag.'s Decision at 10.) This statement does not appear to be seriously disputed by any party. But, as described by both the commission and this court's magistrate, nitrogen is not deadly in all quantities. Rather, the danger arises from the amounts of other gases present in the atmosphere relative to the concentration of nitrogen. (*See* Stipulation at 477 ("Nitrogen is naturally occurring, but it is a hazardous chemical as defined by OSHA when the concentration exceeds thresholds at which it starts to displace oxygen in the environment.

So this is a hazardous gas because of the concentration levels that we were at.").) As described by Dr. Bizzak in his report, nitrogen "is largely inert [and] nontoxic," but it "is dangerous because it can rapidly displace oxygen in the air such that the oxygen level falls below the level needed to sustain life." (*Id.* at 378.) From such evidence, the SHO concluded the air contaminant rules did not apply because nitrogen "is not per se toxic." (*Id.* at 492.)

{¶ 16} The interpretation of a specific safety requirement may only be corrected in mandamus upon a showing that the commission abused its discretion. *Precision Steel Servs.* at ¶ 21. "[T]he commission 'has the discretion to interpret its own rules; however, where the application of those rules to a unique factual situation gives rise to a patently illogical result, common sense should prevail.'" *State ex rel. Lamp v. J.A. Croson Co.*, 75 Ohio St.3d 77, 78-79 (1996), quoting *State ex rel. Harris v. Indus. Comm.*, 12 Ohio St.3d 152, 153 (1984). Additionally, no deference is given to the commission's interpretation when it implicitly adds language to the text of a rule. *Precision Steel Servs.* at ¶ 21, quoting *Lamp* at 79-80. Because the commission added a requirement to the text of Ohio Adm.Code 4123:1-5-01(B)(4) and excluded a reference to the concentration of the alleged toxic gas, we find that the commission abused its discretion.[3]

{¶ 17} Former Ohio Adm.Code 4123:1-5-01(B)(4) defines "air contaminants" as "hazardous concentrations of fibrosis-producing or toxic dusts, toxic fumes, toxic mists, toxic vapors, or toxic gases, or any combination of them when suspended in the atmosphere." Therefore, the rule contains three elements: (1) hazardous concentrations of the (2) toxic substance (3) when suspended in the atmosphere. "Hazardous concentrations," in turn, are those concentrations "which are known to be in excess of those

---

[3] We acknowledge the Supreme Court of Ohio has recently spoken on administrative deference in contexts different from the one we face here. *See TWISM Ents., L.L.C. v. State Bd. of Registration for Professional Engineers & Surveyors*, 172 Ohio St.3d 225, 2022-Ohio-4677; *see also In re Alamo Solar I, L.L.C., ___ Ohio St.3d ___, 2023-Ohio-3778, ¶ 13. In its most recent decision reviewing the commission's interpretation of one of its own regulations in a VSSR matter, the court briefly stated in a footnote, "[W]e need not decide the extent to which we should defer to the commission's interpretation of a specific safety rule * * * because the parties did not brief this point and the case can be resolved on other grounds." *State ex rel. Cassens Corp. v. Indus. Comm., ___ Ohio St.3d ___, 2024-Ohio-526, ¶ 19, fn. 6. Because we are faced with a similar situation, we follow the court's lead. Here, as in *Cassens*, the parties did not raise this issue and the case can be resolved on other grounds. Under either the historic standard or a de novo standard of review, the outcome would be the same.

which would not ***normally*** result in injury to an employee's health." (Emphasis added.) Former Ohio Adm.Code 4123:1-5-01(B)(74). As evident, the modifier used by the SHO to conclude that nitrogen is not toxic—"per se"—appears nowhere in the text of the rule. Describing something as "per se" toxic implies some gases are intrinsically toxic while others are not, regardless of their concentration and the environment in which they are found. This heightened standard employed by the SHO renders the phrase "hazardous concentrations" in the definition meaningless. Including a reference to the amount of the substance makes clear that toxicity can only be understood in relation to its relative concentration in the atmosphere. This is buoyed by the contemporaneous definition of hazardous concentrations, which are amounts "known to be ***in excess*** of those which would ***not normally*** result in injury to an employee's health." (Emphasis added.) Former Ohio Adm.Code 4123:1-5-01(B)(74). In order for this definition to make sense, it must be understood to mean a substance becomes toxic when it is present in the atmosphere at an abnormal level. This is not a static amount, but a threshold relative to the unique properties of each substance.

{¶ 18} The SHO relied on Dr. Bizzak's report, materials, and testimony to find that nitrogen is not inherently toxic but becomes dangerous and potentially lethal in large quantities due to its ability to deplete oxygen in the air. (*See* Stipulation at 492.) Apart from Dr. Bizzak's report and testimony, the SHO specifically cited two materials Dr. Bizzak submitted to support her finding—an article titled "Use Nitrogen Safely" and a safety bulletin published by the U.S. Chemical Safety and Hazard Investigation Board titled "Hazards of Nitrogen Asphyxiation." (*Id*.) We do not find that either supports the SHO's interpretation of "toxic." In "Use Nitrogen Safely," the phrase cited by the SHO that "[n]itrogen is * * * nontoxic and largely inert" is followed by "[i]nhalation of excessive amounts of nitrogen can cause dizziness, nausea, vomiting, loss of consciousness, and death (Table 2)." (*Id*. at 412.) The U.S. Chemical Safety and Hazard Investigation Board safety bulletin describes nitrogen as "safe to breathe only when mixed with the appropriate amount of oxygen." (Emphasis deleted.) (*Id*. at 418.) "If the concentration of nitrogen is too high (and oxygen too low), the body becomes oxygen deprived and asphyxiation occurs." (*Id*.) And another article submitted by Dr. Bizzak titled "Dangers of oxygen-deficient atmospheres" states, "Asphyxiation is the greatest hazard associated with nitrogen

and other inert gases, such as argon and helium.  However, the addition of any gas, except oxygen, to air reduces the oxygen concentration through displacement and dilution."  (*Id.* at 407.)

{¶ 19} The Eighth District Court of Appeals recently considered the meaning of "toxic" as it relates to tort law:

> To properly evaluate the admissibility of these opinions, some understanding of toxicology, as it relates to the law of torts, is necessary. "All substances are poisonous — there is none which is not; the dose differentiates a poison from a remedy." David L. Eaton, *Scientific Judgment and Toxic Torts — A Primer in Toxicology for Judges and Lawyers*, 12 Journal of Law & Policy 11 (2003). Alcohol, aspirin, sunlight, vitamins, and minerals are not harmful, and may be beneficial at low levels, but can cause harm in higher doses. Again, it is "the dose that makes the poison." Bernard D. Goldstein & Mary Sue Henifin, *Reference Guide on Toxicology*, Reference Manual on Scientific Evidence 401, 403 (West Group 2d Ed.2000).
>
> The threshold at which a substance becomes poisonous is not always easy to identify, but that does not mean it does not exist. Unless the plaintiff is exposed to a toxic level of a substance, the substance will not cause the plaintiff any harm. *Id.*

*Watkins v. Affinia Group*, 8th Dist. No. 102538, 2016-Ohio-2830, ¶ 27-28.  We find this discussion especially relevant to the dispute here.  It corroborates our understanding of "toxic" as a characteristic intrinsically linked to its concentration and acknowledges that a substance can be both beneficial in appropriate quantities but harmful in excess, an understanding that manifests in the definition provided by former Ohio Adm.Code 4123:1-5-01(B)(4) and (74).

{¶ 20} The SHO, presumably comparing nitrogen to other gases, found that nitrogen, "in and of itself, is not toxic."  (Stipulation at 492.)  But, again, that presumes there are gases that are toxic in any quantity and in any environment, in contrast to the manner in which nitrogen is dangerous.  As the Eighth District Court of Appeals noted in *Watkins*, "[u]nless the [person] is exposed to a toxic level of a substance, the substance will not cause the [person] any harm." *Watkins* at ¶ 28.  Inhaling air with insufficient oxygen is the corollary of inhaling air with excessive nitrogen.  It is the concentration of nitrogen

in the atmosphere that causes the harm. (*See* Stipulation at 418.) Nitrogen is only safe to breathe when mixed with the appropriate amount of oxygen. (*Id.*) When Mr. Ray entered the control room, the concentration of nitrogen was in excess of safe levels. In that moment, the nitrogen in the room was toxic due to its concentration relative to oxygen.

{¶ 21} The evidence in the record established the safe levels of nitrogen and oxygen under normal conditions and their unsafe concentrations at the time of Mr. Ray's death. The commission's order added a requirement to the definition of "air contaminants" that requires a claimant to prove a gas is "per se" toxic, ignoring the rule's consideration of relative concentration in its own definition. Finding that nitrogen is a nontoxic gas with lethal properties at certain concentrations is an illogical result contrary to the intention of the code. *See, e.g., Pennant Moldings, Inc.*, 2013-Ohio-3259 at ¶ 16.

{¶ 22} Because the SHO erroneously added language to former Ohio Adm.Code 4123:1-5-01(B)(4), the SHO erred in concluding that nitrogen is not an air contaminant. The record before the commission established the relative concentrations of nitrogen and oxygen at the time of Mr. Ray's death, and it was undisputed that those relative concentrations caused his death. (*See* Sept. 29, 2023 Memo in Opp. at 2.) Therefore, we must conclude that the commission abused its discretion in denying the application for a VSSR award on that basis. Because neither the magistrate nor the commission completed the VSSR analysis after concluding that nitrogen is not an air contaminant, we remand this case to the commission with instructions to engage in the remainder of the VSSR analysis.

## III. Disposition

{¶ 23} After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of Ms. Culver's arguments, we sustain her sole objection. Accordingly, we adopt the magistrate's findings of fact and modify the conclusions of law for the reasons discussed above. We grant a limited writ of mandamus directing the commission to vacate its January 13, 2022 order and issue a new order adjudicating Ms. Culver's application consistent with law and this decision.

*Objection sustained*;
*limited writ of mandamus granted.*

BEATTY BLUNT and JAMISON, JJ., concur.

_____

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State ex rel. Sharmel J. Culver, | : | |
| Relator, | : | |
| v. | : | No.  22AP-292 |
| Industrial Commission of Ohio et al., | : | (REGULAR CALENDAR) |
| Respondents. | : | |

M A G I S T R A T E ' S   D E C I S I O N

Rendered on August 18, 2023

*Karp Steiger Co., L.P.A.,* and *David J. Steiger,* and *Flowers & Grube,* and *Louis E. Grube, Paul W. Flowers,* and *Melissa A. Ghrist,* for relator.

*Dave Yost,* Attorney General, and *Andrew J. Alatis,* for respondent Industrial Commission of Ohio

*Zashin & Rich Co., LPA, Jeffrey J. Wedel,* and *Scott Coghlan,* for respondent TimkenSteel Corporation.

IN MANDAMUS

{¶ 24} Relator, Sharmel J. Culver, seeks a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order finding that respondent Timkensteel Corporation ("Timkensteel") did not commit a violation of a specific safety requirement ("VSSR").

**I. Findings of Fact**

{¶ 25} 1. Relator is the surviving spouse of Kenneth B. Ray, Jr., who perished in an accident on March 20, 2016 in the course of and arising out of his employment with Timkensteel. Ray died as a result of asphyxiation due to the displacement of oxygen by nitrogen in the elevator motor room at the Timkensteel Faircrest Plant in Canton, Ohio.

{¶ 26} 2. The elevator motor room, also referred to as the elevator motor control room or elevator control room, stored the motor to the freight elevator. The room was accessed by a person-sized door. The room was designed to be enclosed and to maintain a positive air pressure in order to minimize dust levels inside the room. An air handling unit located one floor below the elevator motor room provided the air to the room. The air handling unit's fans pulled outside air through a filter into the elevator motor room. Periodically, the fans would stop, and a brief burst of pressurized nitrogen gas would be applied to the filters to dislodge particulates in order to help clean the filters. The flow of nitrogen gas would then cease, and the fans would resume operation.

{¶ 27} 3. On the morning of March 20, 2016, Ray was completing his assigned task of inspecting fire extinguishers at the Faircrest Plant. Ray proceeded alone to the elevator motor room to inspect the room's fire extinguisher. However, prior to Ray's arrival in the room, the air handling unit's fans had malfunctioned and ceased operation. Additionally, nitrogen had been leaking into the room, which displaced the room's oxygen. Upon entering the elevator motor room, Ray lost consciousness and died of asphyxiation within seconds. Shortly following the discovery of Ray's body, an evaluation of the elevator motor room revealed that the oxygen level in the room was 4.7 percent. Oxygen levels below approximately 19.5 percent produce adverse reactions in the human body.

{¶ 28} 4. A first report of injury, occupational disease or death form ("FROI-1") was filed with the Bureau of Workers' Compensation ("bureau") on April 21, 2016. Timkensteel, as a self-insured employer, certified the claim for the allowed condition of death by asphyxia on September 9, 2016. On January 20, 2017, relator filed an IC-8/9 application for additional award for violation of specific safety requirement in a workers' compensation claim. Relator listed alleged violations of (1) Ohio Adm.Code 4123:1-5-22, (2) Ohio Adm.Code 4123:1-5-18(C), and (3) Ohio Adm.Code 4123:1-5-17(F). Relator subsequently amended the application to include an alleged violation of Ohio Adm.Code 4123:1-5-18(E)(2), (3), and (4).

{¶ 29} 5. The bureau's Safety Violations Investigations Unit released a report of investigation dated April 11, 2017.

{¶ 30} 6. At the request of relator's counsel, David J. Bizzak, Ph.D., produced a report dated September 7, 2021 and testified at the VSSR hearing. Dr. Bizzak submitted multiple articles in support of his opinion, including (1) "Dangers of oxygen-deficient atmospheres," (2) "Use Nitrogen Safely," and (3) a safety bulletin from the U.S. Chemical Safety and Hazard Investigation Board titled "Hazards of Nitrogen Asphyxiation." (Stip. at 407-27.)

{¶ 31} 7. A commission staff hearing officer ("SHO") conducted a hearing on the application for VSSR award on November 4, 2021. At the hearing, relator withdrew the alleged violations of Ohio Adm.Code 4123:1-5-22 and Ohio Adm.Code 4123:1-5-18(E)(2), (3), and (4). In an order mailed January 13, 2022, the SHO denied relator's VSSR application.

{¶ 32} In the order, the SHO rejected Timkensteel's argument that the elevator motor room was not a workshop or factory, finding that the room met the definition of workshop because it contained power-driven machinery and manual labor was performed therein. With regard to the alleged violation of Ohio Adm.Code 4123:1-5-17(F), the SHO noted that it was first necessary to determine whether nitrogen was an air contaminant. Under the version of the rule in effect on the date of Ray's death, it was necessary to determine whether nitrogen was a toxic gas. While the SHO found that nitrogen was present in its gaseous form, the SHO concluded there was no evidence to support that nitrogen was toxic. In support of this determination, the SHO relied on two of the aforementioned articles submitted in support of Dr. Bizzak's opinion. The SHO also relied on the testimony of Dr. Bizzak as follows:

> 1.      [Relator's] expert, David Bizzak, Ph.D., P.E., testified at the hearing nitrogen is **not** a toxic gas. (Transcript page 76). He repeatedly stated his opinion that nitrogen was an air contaminant because it is a "hazardous chemical." (Transcript pages 64, 78, 81). This is not the definition of the specific safety requirement at issue.

(Emphasis sic.) (Stip. at 492.) Considering the evidence presented by relator expressly indicating nitrogen gas is nontoxic and the requirement to construe all reasonable doubts

concerning the interpretation of the safety requirement in favor of the employer, the SHO found Ohio Adm.Code 4123:1-5-17(F) was not applicable.

{¶ 33} Next, with regard to the alleged violation of Ohio Adm.Code 4123:1-5-18(C), the SHO found the use of the phrase " 'hazardous concentrations' of air contaminants" did not alter the definition of air contaminants. Because it had been determined that nitrogen gas was not a toxic gas and, therefore, not an air contaminant, the SHO found Ohio Adm.Code 4123:1-5-18(C) was also not applicable. On this basis, the SHO found relator had not substantiated the violation of the cited specific safety requirements and denied relator's January 20, 2017 application for violations of specific safety requirements.

{¶ 34} 8. On March 24, 2022, the commission denied a motion for rehearing filed by relator.

{¶ 35} 9. On May 17, 2022, relator filed the instant mandamus action.

## II. Discussion and Conclusions of Law

{¶ 36} Relator asserts entitlement to a writ of mandamus granting the VSSR application on the basis that the commission erred in interpreting the definition of the term "air contaminant" under the applicable provisions of the Ohio Administrative Code.

## A. Violations of Specific Safety Requirements

{¶ 37} The Ohio Constitution provides the commission with authority to determine VSSR claims, providing in pertinent part:

> For the purpose of providing compensation to workmen and their dependents, for death, injuries or occupational disease, occasioned in the course of such workmen's employment, laws may be passed establishing a state fund to be created by compulsory contribution thereto by employers, and administered by the state, determining the terms and conditions upon which payment shall be made therefrom. * * * Such board shall have full power and authority to hear and determine whether or not an injury, disease or death resulted because of the failure of the employer to comply with any specific requirement for the protection of the lives, health or safety of employ[e]es, enacted by the General Assembly or in the form of an order adopted by such board, and its decision shall be final.

Ohio Constitution, Article II, Section 35. R.C. Chapter 4121 "reflects this constitutional provision of authority and addresses VSSR violations." *Zarbana Indus. v. Hayes*, 10th Dist. No. 18AP-104, 2018-Ohio-4965, ¶ 17. R.C. 4121.47(A) provides that "[n]o employer shall violate a specific safety rule adopted by the administrator of workers' compensation pursuant to [R.C. 4121.13] or an act of the general assembly to protect the lives, health, and safety of employees pursuant to [Ohio Constitution, Article II, Section 35]." A specific safety requirement is one that is (1) enacted either by the General Assembly or through an order of the Industrial Commission; (2) is specific, not general; and (3) is made for the protection of the lives, health, or safety of employees. *State ex rel. Cotterman v. St. Mary's Foundry*, 46 Ohio St.3d 42, 44 (1989), citing *State ex rel. Trydle, v. Indus. Comm.*, 32 Ohio St.2d 257 (1972), paragraph one of the syllabus.

{¶ 38} "A 'specific requirement' is more than a general course of conduct or general duty or obligation flowing from the employer-employee relationship; rather, it 'embraces such lawful, specific and definite requirements or standards of conduct * * * [that] are of a character plainly to apprise an employer of his legal obligation toward his employees.' " *State ex rel. Precision Steel Servs. v. Indus. Comm. of Ohio*, 145 Ohio St.3d 76, 2015-Ohio-4798, ¶ 17, quoting *Trydle* at paragraph one of the syllabus. Specific safety requirements "must 'forewarn the employer and establish a standard which [the employer] may follow.' " *State ex rel. G & S Metal Prods. v. Moore*, 79 Ohio St.3d 471, 476 (1997), quoting *State ex rel. Howard Eng. & Mfg. Co. v. Indus. Comm.*, 148 Ohio St. 165 (1947), paragraph one of the syllabus. "[S]pecific safety requirements are ' "intended to protect employees against their own negligence and folly as well as to provide them a safe place to work." ' " *State ex rel. Byington Builders, Ltd. v. Indus. Comm. of Ohio*, 156 Ohio St.3d 35, 2018-Ohio-5086, ¶ 40, quoting *Cotterman* at 47, quoting *State ex rel. U.S. Steel Corp. v. Cook*, 10 Ohio App.3d 183, 186 (10th Dist.1983). Thus, a "VSSR award is intended to penalize employers for failing to comply with [specific safety requirements], and only those acts within the employer's control should serve as the basis for establishing a VSSR." *State ex rel. Ohio Paperboard v. Indus. Comm. of Ohio*, 152 Ohio St.3d 155, 2017-Ohio-9233, ¶ 20.

{¶ 39} "An award for a VSSR is 'a new, separate, and distinct award' over and above standard workers' compensation benefits. It is not covered by an employer's workers'

compensation premium." *Precision Steel* at ¶ 15, quoting *State ex rel. Newman v. Indus. Comm.*, 77 Ohio St.3d 271, 272 (1997). In order to prove a VSSR claim, a claimant must establish that (1) an applicable and specific safety requirement was in effect at the time the injury occurred, (2) the employer failed to comply with the requirement, and (3) the failure to comply was the proximate cause of the injury in question. *State ex rel. Scott v. Indus. Comm. of Ohio*, 136 Ohio St.3d 92, 2013-Ohio-2445, ¶ 11.

{¶ 40} "Because a VSSR award is a penalty, a specific safety requirement must be strictly construed and all reasonable doubts concerning the interpretation must be resolved in favor of the employer." *State ex rel. 31, Inc. v. Indus. Comm.*, 152 Ohio St.3d 350, 2017-Ohio-9112, ¶ 21, citing *State ex rel. Burton v. Indus. Comm.*, 46 Ohio St.3d 170, 172 (1989). However, "the strict-construction rule does not apply in resolving factual disputes," and such rule "permits neither the commission nor a reviewing court to construe the *evidence* of a VSSR strictly in the employer's favor." (Emphasis sic.) *State ex rel. Supreme Bumpers, Inc. v. Indus. Comm.*, 98 Ohio St.3d 134, 2002-Ohio-7089, ¶ 70.

## B. Requirements for Mandamus

{¶ 41} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, a relator must establish a clear legal right to the requested relief, that the commission has a clear legal duty to provide such relief, and the lack of an adequate remedy in the ordinary course of the law. *State ex rel. Belle Tire Distribs. v. Indus. Comm.*, 154 Ohio St.3d 488, 2018-Ohio-2122; *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). " 'The interpretation of a specific safety requirement is within the final jurisdiction of the commission and may be corrected in mandamus only upon a showing that the commission abused its discretion.' " *State ex rel. United States Tubular Prods. v. Indus. Comm. of Ohio*, 165 Ohio St.3d 85, 2021-Ohio-1174, ¶ 24, quoting *Precision Steel*, 2015-Ohio-4798, at ¶ 21. *See State ex rel. Lamp v. J.A. Croson Co.*, 75 Ohio St.3d 77, 79-80 (1996) ("While we are normally obligated to defer to the commission's interpretation of its own rules, we will not defer when the commission's interpretation implicitly adds language to the text of the rule.").

{¶ 42} Where the commission's factual determination is supported by some evidence, it has not abused its discretion and this court must uphold the decision. *State*

*ex rel. Seibert v. Richard Cyr, Inc.*, 157 Ohio St.3d 266, 2019-Ohio-3341, ¶ 44, citing *State ex rel. Pass v. C.S.T. Extraction Co.*, 74 Ohio St.3d 373, 376 (1996); *State ex rel. Armstrong Steel Erectors, Inc. v. Indus. Comm.*, 144 Ohio St.3d 243, 2015-Ohio-4525, ¶ 13. The commission is "exclusively responsible for assessing the weight and credibility of evidence." *State ex rel. George v. Indus. Comm.*, 130 Ohio St.3d 405, 2011-Ohio-6036, ¶ 11, citing *State ex rel. Burley v. Coil Packing, Inc.*, 31 Ohio St.3d 18 (1987). Where the commission's decision is supported by some evidence, the presence of contrary evidence in the record is immaterial. *State ex rel. West. v. Indus. Comm.*, 74 Ohio St.3d 354, 356 (1996), citing *Burley.*

## C. Application

{¶ 43} Ohio Adm.Code Chapter 4123:1-5 sets forth specific safety requirements relating to workshop and factory safety. *See* Ohio Adm.Code 4123:1-5-01(A). Relator alleged violations of Ohio Adm.Code 4123:1-5-17(F) and Ohio Adm.Code 4123:1-5-18(C). At the time of the incident in question, Ohio Adm.Code 4123:1-5-18 provided as follows:

> (C) Where employees are exposed to hazardous concentrations of air contaminants, the air contaminants shall be minimized by at least one of the following methods:
>
> (1) Substitute a non-hazardous, or less hazardous material;
>
> (2) Confine or isolate the contaminants;
>
> (3) Remove at or near source;
>
> (4) Dilution ventilation;
>
> (5) Exhaust ventilation; (for examples of exhaust ventilation, see rule 4123:1-5-99.2 of the Administrative Code).
>
> (6) Using wet methods to allay dusts. Note: Good housekeeping is of definite value in minimizing air contaminants created by dusts.

Ohio Adm.Code 4123:1-5-18(C). Then-effective Ohio Adm.Code 4123:1-5-17 provided:

> (F) Respiratory protection.
>
> (1) Where there are air contaminants as defined in rule 4123:1-5-01 of the Administrative Code, the employer shall provide respiratory equipment approved for the hazard. It shall be the responsibility of the employee to use the

respirator or respiratory equipment provided by the employer, guard it against damage and report any malfunction to the employer. Note: See appendix to this rule for basic guides for the selection of respirators.

11.      (2) This requirement does not apply where an effective exhaust system (see rule 4123:1-5-18 and 4123:1-5-992 of the Administrative Code) or where other means of equal or greater protection have been provided.

Ohio Adm.Code 4123:1-5-17(F).

{¶ 44} Under the version of the Ohio Administrative Code in effect at the time of Ray's death, "air contaminants" were defined as "hazardous concentrations of fibrosis-producing or toxic dusts, toxic fumes, toxic mists, toxic vapors, or toxic gases, or any combination of them when suspended in the atmosphere." Ohio Adm.Code 4123:1-5-01(B)(4).[4] At that time, the phrase "[h]azardous concentrations (as applied to air contaminants)" was defined as "concentrations which are known to be in excess of those which would not normally result in injury to an employee's health." Ohio Adm.Code 4123:1-5-01(B)(74).[5]

{¶ 45} The applicability of Ohio Adm.Code 4123:1-5-17(F) and Ohio Adm.Code 4123:1-5-18(C) depend on a finding that there existed "air contaminants" as defined under Ohio Adm.Code 4123:1-5-01(B)(4). The SHO found the evidence did not support a finding that nitrogen was an air contaminant because it was not a toxic gas. Relator asserts the commission made a clear mistake of law in its interpretation of the term "air contaminant." Relator argues the commission should have applied the plain meaning of

---

[4] Following the incident in question in this matter, Ohio Adm.Code 4123:1-5-01(B)(4) was amended effective June 1, 2016, altering the definition of "air contaminants" to "concentrations of dust, mist, fume, gas or vapor, or any combination thereof when suspended in the atmosphere." Ohio Adm.Code 4123:1-5-17 and Ohio Adm.Code 4123:1-5-18(C) were also amended effective June 1, 2016. Because a claimant must prove that "an applicable and specific safety requirement exists, which was *in effect at the time of the injury*," the former versions of the administrative code in place at the time of the incident on March 20, 2016 apply in this matter. (Emphasis added.) *State ex rel. DeMarco v. Indus. Comm.*, 10th Dist. No. 19AP-227, 2021-Ohio-1937, ¶ 6. Thus, all references in this matter to Ohio Administrative Code provisions relating to the alleged specific safety requirement violations are to the versions of the code in effect at the time of the incident.

[5] Effective June 1, 2016, Ohio Adm.Code 4123:1-5-01(B)(74) was amended, altering the definition of "[h]azardous concentrations (as applied to air contaminants)" to "concentrations of air contaminants which are in excess of established occupational exposure limits."

the term "toxic" to find that a high concentration of nitrogen is toxic and an air contaminant within the meaning of Ohio Adm.Code 4123:1-5-01(B)(4).

**{¶ 46}** In his report, Dr. Bizzak stated: "Nitrogen is a colorless, odorless gas that compromises 78 percent of the air that we breathe. Because it constitutes such a large percentage of the air that we normally breathe, [it] is largely inert, *nontoxic*, and the average person may consider it to be harmless." (Emphasis added.) (Stip. at 378.) Dr. Bizzak explicitly agreed at the VSSR hearing that nitrogen was "nontoxic." (Stip. at 480.) Additionally, the article titled "Use Nitrogen Safely," which was submitted in support of Dr. Bizzak's opinion, contains the following statements: "*Nitrogen* is sometimes mistakenly considered harmless because it *is nontoxic* and largely inert." (Emphasis added.) (Stip. at 412.)

**{¶ 47}** Here, it is not necessary to resort to dictionary definitions of the word "toxic," because relator provided some evidence demonstrating that nitrogen gas is, in fact, not a toxic gas. Relator bore the burden of presenting evidence establishing Timkensteel violated the specific safety requirements at issue. *State ex rel. Gilbert v. Indus. Comm.*, 10th Dist. No. 05AP-777, 2006-Ohio-4484, ¶ 12; *Scott*, 2013-Ohio-2445, at ¶ 31 (finding relator "did not discharge his burden of establishing that he is entitled to a VSSR award"). The record contains some evidence supporting the conclusion that nitrogen did not meet the definition of air contaminants because it is not a toxic gas, which thereby precludes establishing violations of Ohio Adm.Code 4123:1-5-17(F) and Ohio Adm.Code 4123:1-5-18(C). As there was some evidence to support its determination, the commission did not commit an abuse of discretion.

**{¶ 48}** However, even if one were to resort to dictionary definitions of the term "toxic," as relator urges, relator's position would be unchanged. " 'The [commission's] rules for specific safety requirements have the effect of legislative enactments' and therefore are 'subject to the ordinary rules of statutory construction.' " (Brackets sic.) *State ex rel. Parks v. Indus. Comm.*, 85 Ohio St.3d 22, 25 (1999), quoting *State ex rel. Miller Plumbing Co. v. Indus. Comm.*, 149 Ohio St. 493, 496-97 (1948). *See* R.C. 1.42; *Dalton v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-827, 2014-Ohio-2658, ¶ 38 ("[A] court interprets an administrative rule in the same manner it would interpret a statute."). In interpreting an administrative rule, a court first looks at the rule's plain

language. *Dalton* at ¶ 38. If such language is unambiguous, the court applies the administrative rule as written. *Id.* Where a term is not defined in the applicable division of the Ohio Administrative Code, a court "must afford the word its common meaning." *Byington Builders*, 2018-Ohio-5086, at ¶ 23.

{¶ 49} Black's Law Dictionary defines "toxic" as "[h]aving the character or producing the effects of a poison; produced by or resulting from a poison; poisonous." *Black's Law Dictionary* 1720 (10th Ed.2014). Similarly, the New Oxford American Dictionary defines "toxic" in part as "poisonous" and "relating to or caused by poison." *New Oxford American Dictionary* 1833 (3d Ed.2010). Merriam-Webster's Collegiate Dictionary defines "toxic" in part as "containing or being poisonous material esp. when capable of causing death or serious debilitation." *Merriam-Webster's Collegiate Dictionary* 1323 (11th Ed.2014). Thus, toxic is commonly understood to mean having the qualities of, producing the effects of, or resulting from poison, with poison being the commonality between the definitions.

{¶ 50} The article "Hazards of Nitrogen Asphyxiation" by the U.S. Chemical Safety and Hazard Investigation Board, which was submitted in support of Dr. Bizzak's opinion, contains the following statements: "Nitrogen is not a 'poison' in the traditional sense." (Stip. at 419.) Thus, even considering the common meaning of toxic, there exists some evidence in the record to support that nitrogen is not a poison, and, therefore, is not toxic as such term is understood and applied under the plain text of the Ohio Administrative Code.

{¶ 51} Nevertheless, relator, citing another dictionary's definitions of poisonous and toxic, argues the SHO was "legally mistaken" in concluding that relator's evidence demonstrating nitrogen was a "hazardous chemical" was insufficient to establish that nitrogen was toxic. (Relator's Brief at 21.) Relator points to Dr. Bizzak's testimony at the VSSR hearing in arguing it was established that nitrogen is a hazard. At the VSSR hearing, Dr. Bizzak described the effects of nitrogen displacing oxygen in breathable air as follows: "So what happens is that as the nitrogen starts to come into the room, the amount of oxygen in the atmosphere that is being breathed by people decreases * * * . As it comes down, it gets to a point where it's not habitable. For example, I believe at less than ten percent or so, it -- we're talking a matter of less than a minute of somebody losing

consciousness." (Stip. at 475.) When asked whether "too much nitrogen in an enclosed room is dangerous," Dr. Bizzak responded that "[i]t's a hazard, yes." (Stip. at 475.) This testimony is consistent with the article titled "Use Nitrogen Safely," which stated that nitrogen "can act as a simple asphyxiant by displacing the oxygen in air to levels below that required to support life." (Stip. at 412.) Furthermore, the article "Hazards of Nitrogen Asphyxiation" by the U.S. Chemical Safety and Hazard Investigation Board, which was also submitted in support of Dr. Bizzak's opinion, states that nitrogen "presents a hazard when it displaces oxygen, making the atmosphere hazardous to humans." (Stip. at 419.)

{¶ 52} Relator argues that "[t]he plain meaning of 'toxic' as poisonous, and the ordinary meaning of 'poisonous' as 'destructive' and 'harmful,' demonstrates that a high concentration of nitrogen is toxic and an air contaminant within the definition of Ohio Administrative Code 4123:1-5-01(B)(4)." (Relator's Brief at 21-22.) In order to reach this conclusion, however, relator's argument relies on the insertion of the phrase "high concentration," a phrase found nowhere in the dictionary definitions cited by relator.

{¶ 53} In the relevant portions of the Ohio Administrative Code in effect at the time, various provisions addressed the phrase "hazardous concentrations." The usage of the phrase "hazardous concentrations" demonstrates that the rule's drafters were aware of how to address situations involving concentrations and also knew how to say hazardous when that was what was intended. However, Ohio Adm.Code 4123:1-5-01(B)(4) required a finding of a *toxic* gas in order to qualify as an air contaminant. There was evidence in this matter that nitrogen is nontoxic, though hazardous in concentrations where it displaces oxygen, thereby leading to unsafe levels of oxygen. Defining "toxic gas" to include "high or hazardous concentrations of a nontoxic gas" gives rise to a redundant and absurd result with respect to the definition of "air contaminants" under Ohio Adm.Code 4123:1-5-01(B)(4). *See State ex rel. Baroni v. Colletti*, 130 Ohio St.3d 208, 2011-Ohio-5351, ¶ 18, quoting *Morning View Care Ctr.-Fulton v. Ohio Dept. of Human Servs.*, 148 Ohio App.3d 518, 2002-Ohio-2878, ¶ 36 (10th Dist.) (" 'The interpretation of statutes and administrative rules should follow the principle that neither is to be construed in any way other than as the words demand.' "); *State ex rel. Haines v. Rhodes*, 168 Ohio St. 165, 170 (1958) (stating that "a construction which results in a ridiculous or absurd situation must be avoided if reasonably possible"). The text of the rule is not

ambiguous and must therefore be applied as written. *Dalton,* 2014-Ohio-2658, at ¶ 38. As a result, the magistrate cannot find the SHO erred in rejecting relator's preferred construction of the relevant Ohio Administrative Code provisions. Furthermore, this finding is in line with the rule of strict construction and resolving all reasonable doubts concerning the interpretation in favor of the employer. *Burton,* 46 Ohio St.3d at 172.

{¶ 54} Finally, relator argues the SHO made an obvious mistake of fact by focusing on the toxicity of nitrogen as it occurs naturally in air as opposed to in the concentration present in the elevator motor room on March 20, 2016. Although described in terms of a mistake of fact, this is merely a restatement of the argument that the definition of toxic should include circumstances in which a nontoxic gas has hazardous or lethal effect due to its concentration. Relator disagrees with the SHO's conclusion that "[n]o evidence has been presented to substantiate nitrogen gas is a toxic gas." (Stip. at 492.) However, as previously described, relator's expert, Dr. Bizzak, showed through his testimony and the articles in support of his opinion that nitrogen is nontoxic. Although relator attempts to distinguish this evidence, the record clearly reflects that some evidence supported the SHO's factual conclusion.

{¶ 55} In reaching this conclusion, the magistrate in no way intends to minimize the seriousness of the circumstances leading to and resulting in Ray's untimely death. This conclusion is made more difficult by the removal of the term "toxic" in the administrative code's definition of "air contaminants" shortly after the incident in question. However, it is well-established that the law in effect at the time of the injury or death applies when determining whether a violation of a specific safety requirement was established. *State ex rel. DeMarco v. Indus. Comm.*, 10th Dist. No. 19AP-227, 2021-Ohio-1937, ¶ 6. Therefore, based on the foregoing, the magistrate concludes the commission did not err in determining relator did not establish violations of the specific safety requirements at issue. As a result, relator has not established a clear legal right to the requested relief or that the commission was under a clear legal duty to provide it.

## D. Conclusion

{¶ 56} Accordingly, it is the decision and recommendation of the magistrate that the requested writ of mandamus should be denied.

/S/ MAGISTRATE
JOSEPH E. WENGER IV


**NOTICE TO THE PARTIES**

12.     Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b). A party may file written objections to the magistrate's decision within fourteen days of the filing of the decision.